Terminal Co. v. Lellyett.

LOUISVILLE & NASHVILLE TERMINAL COMPANY *et al. v.*
JOHN T. LELLYETT.

*(Nashville.    December Term, 1904.)*

1. **VARIANCE.** None between allegations and proof where writ
shows plaintiff sues as trustee and next friend for beneficiaries
though declaration is in his own name, and proof shows title
in him for the beneficiaries.

The holder of the legal title to land as trustee for the beneficial
owners may, as their trustees and next friend, sue to recover
damages to the use of their land, health and comfort caused
by defendant's improper use and maintenance of railroad and
terminal yards, roundhouses, and other accessories in and near
the same; and where the writ or summons shows that the suit
is by him as trustee and next friend for the named beneficial
owners, and the averments in the declaration are in his own
name without more, and the proof shows the title to the land to
be in him for their use and benefit, there is no fatal variance
between the allegation and proof, for it sufficiently appears
from the writ and declaration that the plaintiff was trustee for
the named beneficial owners, and that the suit was brought
for damages to the use of their property, health and comfort.
(*Post, pp.* 372, 373, 384.)

2. **MISJOINDER OF ACTIONS.** Obviated by abandonment of
the claim constituting the misjoinder.

Misjoinder of cause of action may be obviated by abandonment
or withdrawal of the claim that constitutes the misjoinder, with
proper instructions to the jury, and its omission as one of the
elements of recovery or damages in the charge of the trial
judge. (*Post, p.* 385.)

3. **SAME.** None in action for injury to use of land by allegation
of impairment to health of plaintiff's family as a specification
of damages done to land as a home.

Where, in an action for injuries to the use of certain real estate
caused by defendant's improper maintenance and use of rail-

Terminal Co. v. Lellyett.

road and terminal yards, there is no claim for damages for sickness, doctor's bills, etc., and an allegation in the declaration of impairment of the health of plaintiff's family is merely a specification of damages done to the land as a home or place of residence, just as in the destruction of the grass, trees, shrubbery, etc., and the presence of smoke, cinders, etc., the declaration is not objectionable for misjoinder of causes of action, for there is no separate cause of action in favor of the plaintiff's wife and children for injuries to their health. (*Post, pp.* 385, 386.)

4. **PLEADING AND PRACTICE.** Count for injuries to fee as distinguished from recurrent injuries eliminated by charge of court.

Where, in an action by an adjacent landowner for injuries to his land resulting from the defendant's improper operation of railroad and terminal yards, the court, at plaintiff's request or on its own motion, charged that plaintiff could not recover for injuries to the fee and that the proof of the value of the premises must be considered only in determining the question whether the comfortable enjoyment of the premises had been impaired or destroyed, such instruction eliminated counts or causes of action alleged for the recovery of permanent as. distinguished from recurrent damages. (*Post, pp.* 386, 387.)

5. **RAILROAD AND TERMINAL CORPORATIONS.** Location and operation cannot be authorized with immunity from damages for injuries to adjacent property.

Railroad and terminal corporations cannot be authorized, under their charters nor by law, seriously to impair or destroy adjacent property by the location and operation of terminal yards, roundhouses, coal chutes, etc., with immunity from damages for injury to adjacent property resulting from such location and operation of their terminal yards. (*Post, pp.* 388-400, and especially 391.)

Cases cited and approved: Telegraph and Telephone Co. v. Jacobs, 109 Tenn., 727, 741, 743; Madison v. Copper Co., 5 Cates,

114 Tenn—24

Terminal Co. v. Lellyett.

• 331, 342, 343; and numerous cases in other States and countries
cited in the opinion on pages 392-399.

6. **SAME.** **No** damages for injuries from increased railroad
traffic, but damages from operation of railroad terminal yards
and accessories, when.

In an action to recover damages for injury to adjacent property
by the operation of railroad and terminal yards, the plaintiff
is not entitled to recover damages incident to the increase of
traffic into and through the station over tracks laid fifty years
ago, when his property was vacant, or over other tracks subse-
quently laid as the traffic increased and required them, but may
recover damages for injuries resulting to his property from the
operation of terminal yards, roundhouses, coal chutes, etc., and
the switch yards and tracks necessary to operate them, where
the ailroad terminal corporation was organized and the termi-
nal yards and facilities were constructed after the erection of
plaintiff's house. (*Post, pp.* 400, 401.)

7. **DAMAGES.** **For** injury to property from operation of public
or quasi public enterprises, when and when not.

The law does not allow damages for annoyances and discomforts
resulting from the operation of public or quasi public enter-
prises, unless they go to such an extent as to injure the usable
and rental or permanent value of the property, for they must
amount, to some extent, to the taking of the value of the prop-
erty, either temporary or permanent, and depriving the owner
thereof. (*Post, pp.* 401-403.)

Cases cited and approved: Railroad v. Bingham, 87 Tenn., 522;
Demarest v. Hardham, 34 N. J. Eq., 469.

8. **SAME.** **Measure** of damages for injury to real estate is its
diminished rental value, when.

Where railroad terminal yards are operated so carelessly and
negligently as to create a nuisance to plaintiff's adjacent prop-
erty, which might be avoided and obviated by adopting other
means and being more careful in the manner of operating the

Terminal Co. v. Lellyett.

yards, the measure of damages is the injury to the value of the use and enjoyment of the property, measured largely by the diminished value of the property. (*Post, pp.* 403, 404.)

9.  **SAME.** Measure of damages for injury to real estate from operation of railroad terminal yards is the injury to the permanent value, when.

In an action for injury to adjacent property, caused by the operation of railroad terminal yards, where such yards are carefully and properly operated, plaintiff's measure of damages is the injury to the fee and permanent value of the property by the permanent operation of such terminal yards. (*Post, pp.* 404, 405.)

10.  **VERDICTS.** Set aside for excessiveness of damages; case in judgment.

Where in an action for damages for injury to the use and enjoyment of plaintiff's property, by the operation of railroad terminal yards, a verdict awarding plaintiff four thousand dollars damages for such injury for a period of thirty-two months, where the property is worth only seven thousand dollars, is so grossly excessive as to indicate either misapprehension by the jury, or passion, prejudice, or caprice on their part, and will, therefore, be set aside. (*Post, pp.* 405-407.)

---

FROM DAVIDSON.

---

Appeal from the Circuit Court of Davidson County.— J. A. CARTWRIGHT, Judge.

JAMES C. BRADFORD, BAXTER SMITH, PERCY D. MADDIN, SLEMONS & BARTHELL, JOHN B. KEEBLE and CLAUDE WALLER, for Terminal Company and Railroads.

WALTER STOKES and GEORGE A. FRAZER, for Lellyett.

MR. JUSTICE WILKES delivered the opinion of the Court.

This is an appeal in the nature of a writ of error from a judgment against the Louisville & Nashville Railroad Company, the Nashville, Chattanooga & St. Louis Railway and the Louisville & Nashville Terminal Company for $4,000 for alleged injuries from smoke, soot, dust, and noise claimed to be due to the operation of the railroad and terminal yards, roundhouses, etc., at Nashville, Tennessee.

The cause was tried before the Honorable J. A. Cartwright, circuit judge, and a jury. A motion for a new trial was duly made and overruled. A motion in arrest of judgment was then made and overruled. Due and proper exception was taken to the action of the court, and an appeal was prayed to this court.

The writ was issued on August 25, 1902, and required the defendants "to answer John T. Lellyett, trustee, and next friend of Mary R., Mary Frances, and Catherine Lellyett in an action for damages in the sum of ten thousand dollars."

The declaration contains six counts.

The first count alleges that when "he (the plaintiff) became the owner of said property, and up to the time of the location of the terminal station and occupation thereof by defendants, said property was exceedingly valuable; the neighborhood was quiet, free from noise, smoke, and soot, and unpleasant gases, and in every way a desirable place to reside; that, owing to its loca-

tion aforesaid, and its freedom at the time from noise, dust, soot, and noxious gases, plaintiff had beautified said place with shrubbery, trees, grass, and flowers, which would enhance the value of aforesaid property intended for residence purposes."

The declaration then proceeds to state that the terminal company was chartered and authorized to erect a terminal station in Nashville, and did erect the same; that afterwards, under some arrangement with the defendant companies, they have been in the use, operation and occupation of the same; that the terminal yards or grounds lie in close proximity to the plaintiff's property, and defendants have constructed large numbers of tracks thereon, and operate a large number of engines and cars over them; that the noise from the engines and cars is unreasonable and constant day and night; that the defendant companies use a cheap and low grade of soft coal in their engines which emit volumes of black dirty smoke, defiling everything with which it comes in contact, which is due to the negligence of defendants in the operation of their engines; that the engines emit poisonous and noxious gases, which often lie over plaintiff's property like a pall; that defendants negligently erected in close proximity to plaintiff's property large coal bins or chutes, upon which thousands of cars of coal are dumped from a high elevation, causing dust and dirt to arise therefrom, which pass over and settle on plaintiff's property; that defendants have erected a large roundhouse, with a number of pipes or smoke-

stacks, where they fire up and cool off engines, some of which are permitted to remain in said house an unreasonable length of time, and from the smokestacks of which roundhouse the smoke passes over to and settles on the plaintiff's property; that plaintiff's property is not worth near as much as it was before the erection of said depot and terminal station, and said decrease has been owing to the wrongful acts of defendants; that said smoke, soot, creosote, cinders, dust and gases have permanently reduced and injured the value of plaintiff's realty, and have destroyed plaintiff's shrubbery, trees, grass and flowers; and that plaintiff has been damaged the sum of $10,000.

The second count is substantially the same as the first, except that it alleges damage to "his household furniture, ornaments, silver, and such articles," and that the smoke settles upon plaintiff's house and injures his personal property.

The third count alleges the same as the first count, but the damage claimed is for injury to the health of his family.

The fourth count alleges the same facts, and the damages claimed are for permanent injury to the property.

The fifth count alleges the same facts, and avers damages as follows: "Thereby damaging and injuring the furniture, hangings, fixtures, carpets, and property of the plaintiff and his family, ruining and destroying its use by the plaintiff and his family, to his damage ten thousand dollars."

The sixth count alleges similar facts, and claims damages as follows: "And that their result is to destroy the health, peace, comfort, and happiness of his family, and that their peace, health, comfort, and happiness have been injured and destroyed by said reckless, careless, negligent, and willful conduct, to the extent of ten thousand dollars."

The defendants demurred on three grounds:

First. Because of misjoinder of parties and misjoinder of causes of action, in that the suit was for damages for permanent reduction of the value of the property and for damage to the household furniture, and that the smoke and soot had been carried into the systems of the plaintiff and his family, whereby their health was greatly injured; that the plaintiff, as trustee and next friend, cannot sue for injury to the real estate in the same action in which he sues for injury to the health of the parties for whom he is trustee and next friend; that the plaintiff's ownership of the property is joint, and the injury to the health of the plaintiff's is several.

Second. That the declaration is insufficient in law, because it is uncertain, indefinite, and ambiguous.

Third. For misjoinder in causes of action in suing for permanent decrease in the value of real estate, and also for injury to personal property, household furniture, and for loss of personal comfort and of health.

Identical demurrers were filed by all the defendants.

The court sustained the demurrers as to the claim

for damages to the plaintiff, John T. Lellyett, individually. In all other respects the demurrers were overruled, to which due exception was taken.

The defendants filed pleas raising the same questions. The defendant's first plea was the general issue—not guilty.

The second plea was a special plea in which the defendant companies' charters were averred. The plea then further alleged that, when the company's road was first built, Nashville was a village with few inhabitants; that the property on which plaintiff's residence is now situated was vacant; that defendant's shops and terminal facilities were located at the extreme western edge of the town, and that the only feasible location for them was there; that they continued to operate said shops and terminal facilities at such point until the town increased in size, and there was an absolute necessity for larger shops, depots, bigger grounds and terminal facilities, and for new depots for passengers and freight; that, pursuant to this demand, the city of Nashville, a number of years ago, authorized the closing up of certain streets and alleys, and later on the raising of certain streets and the building of certain overhead bridges; that the city itself spent large sums of money in making these improvements; that, in order to furnish a suitable depot and terminal facilities, the railroads entering Nashville co-operated; that the public business increased, and thus increased the operations in the terminal yards; that the erections complained of

were built pursuant to lawful powers, and that the damages complained of are such as are suffered by all persons who live in a city which grows and expands, and who happen to reside near any coal-burning concern that cannot move from place to place; that the location was determined by public necessity and convenience and the demands of commerce, as well as by charter rights; and that the original road was built long before plaintiff's residence was erected, and the proximity of its depots and yards to plaintiff's house has come about by reason of necessary expansion in serving the public.

The third plea was that the topography of the city of Nashville rendered any other location impracticable.

The fourth plea was based upon the public convenience and public necessity for locating the terminal facilities within reasonable reach of the public.

The fifth plea recited the charter of the Nashville & Chattanooga Railroad, and the original location of its road where the present tracks are situated; the original charter of the Louisville & Nashville Railroad Company; the construction of its railroad into Tennessee; its extension from its original depot, on the west bank of the Cumberland river, through the territory now occupied, and past plaintiff's residence; the original charter of the Tennesse & Alabama Railroad, the Nashville & Northwestern Railroad, the Nashville & Decatur Railroad, and other lines extending into Nashville, and their ultimate connections through Nashville and along the tracks now used for terminal purposes near plain-

tiff's residence; the charter of the Louisville & Nashville Terminal Company, and its construction of the terminal facilities, and its lease to the two railroads. The plea further averred that the present terminal facilities were built in order to serve the public and to meet a public demand, and that they are operated solely by the railroad companies, and not by the terminal company; that in said operations said companies used machinery and engines manned by suitable, competent, and skilled employees, and burn the same coal which has been used by railroads in this section since long before the plaintiff became the owner of the property which he claims is injured; that soft coal is the only practicable fuel in the South, and that defendants make no more smoke, noise, dust, ashes, etc., than arise from a reasonably skillful and careful operation of their business; that plaintiff acquired the same property, for the alleged injury of which damages are claimed, when defendants were already operating many engines and trains, and doing a large amount of switching upon their own premises in the necessary transaction of their business, and that the additional smoke, etc., is due to the increased traffic rendered necessary by service to the public; that the location of the yards and terminal facilities was the most reasonable and practicable location to be found, considering the necessities of the public as well as the railroad companies; that defendants rely upon their charter rights for locating and operating their depots, roundhouses, shops, and other terminal facili-

ties, and for operating and running trains in said yards.

The defendants also filed pleas of the statute of limitations of one and three years.

They also filed a plea known in this record as the "John Doe Plea," which is that this property and the plaintiff's property were originally owned by one John Doe, who, for a consideration, conveyed the property now owned by the railroad companies, and over which these operations are had, to the railroad companies, etc. But no proof was introduced under this plea, and it was stricken out.

Plaintiff joined issue on all the pleas except the last named.

The evidence on behalf of the plaintiff tended to show that, at the time he acquired this property, Gowdy street was a quite street, suited for residence purposes; that there was no unusual noise, and no unusual amount of dust, dirt, and cinders; and that it was a comfortable place to live.

That the coal chutes complained of are used for dumping coal from cars into bins, to be used in firing engines; that the cars are hauled up on an inclined trestle, from which the dumping is done.

That the roundhouse had some ten or twelve stacks, running up about forty feet into the air.

That there is a sand or dry house in the yards; that in the terminal operations, trains are made up in the yards, and the switching and operations of engines and

cars are practically constant; that coal is dumped day and night and on Sunday.

That the switch engines move forward and backward continually, and frequently stop opposite plaintiff's house, and the noise and smoke from them come directly to his house.

That the first discomfort he experienced) on account of the smoke, noise, etc., was after the terminal yard opened.

That his family consists of his wife and three children, and they suffer from these discomforts proceeding from the terminal yards.

That as many as twelve or fifteen engines can be seen in the yards at one time, and, when the smoke from these comes over his premises, he can smell it. Sometimes it is impregnated with gas and causes coughing. In the summer time the front windows of his house cannot be opened for any length of time without experiencing trouble from cinders, soot, and smoke.

The furninshings in the house belong to his wife, and he holds the house as trustee for his wife and children, under a deed to him from his mother. He valued the entire property at $7,000 and furniture at $1,500.

There was evidence tending to show that the grass, trees, shrubbery, and flowers in the vicinity died, and that the smoke, soot, and noises were unpleasant, and they disturbed the sleep of himself and family, and damaged both the house and the its furniture and furnish-

ings; that there was considerable noise from the ringing of engine bells, but the whistle was seldom blown.

That the plaintiff has been in the habit of taking his family to the country in the summer, leaving the city the 1st of June, and remaining away until in September.

That the noises from the terminal yards had a tendency to disturb the nervous system, and were disturbing to visitors, but one would get accustomed to it, though at the expense of nervous force.

The defendants introduced in evidence the charters of the several railroads composing the lines using these yards for terminal purposes, and also the charter of the Louisville & Nashville Terminal Company, which constructed the yards and leased them to the two railroad companies, together with the lease itself, the ordinance of the city of Nashville, and the contract between the city and the terminal company for the construction and operation of the yards.

It is not necessary to refer to these charters, leases, consolidations, and connections more in detail.

Owing to the immense growth in travel and traffic, it was deemed advisable and necessary, for the benefit and convenience of the public, to provide new and enlarged terminal facilities at Nashville; and a lot was selected, centrally and conveniently located on Broad street and embracing something like 100 acres, upon which was erected a passenger station house, and a roundhouse, and coal chutes and bins, and a sandhouse,

and a large number of tracks, used for switching and other purposes.    This was in 1900.

Engines and cars have been operated since 1851 within 225 feet of the front of Mr. Lellyett's house, upon tracks that still are used, and are a part of the terminal facilities.

None of the tracks or houses erected under the terminal station plant are nearer to Mr. Lellyett's house than these original tracks; the new and additional tracks being to the west of the original tracks, and further removed from Mr. Lellyett's location.

On the west side of Gowdy street, opposite Mr. Lellyett's house, and between it and the terminal yards, are a number of houses, almost every lot being built upon, so that the smoke, dust, cinders, and noise must pass over these before reaching him.

From Mr. Lellyett's house to the nearest point of the roundhouse is 750 feet; to the center of the roundhouse, 950 feet; and to the most distant wall of the roundhouse is 1,100 feet.

From Mr. Lellyett's house to the nearest point of the coal chutes on Kayne avenue was 700 feet, and the further end of the coal chutes 800 feet.

From his house to the coal bins on Gleaves street, at the nearest point, was 1,150 feet, while the farthermost point was over 1,200.

From his house to the sandhouse was between 1,100 and 1,200 feet.

The yard space between his house and these sand-

Terminal Co. v. Lellyett.

houses and coal chutes is  occupied by tracks used for incoming an  outgoing  trains, and for  switching and yard purposes.

Defendants' evidence  also showed that  there were operated in the terminal yards seventeen engines in the daytime, and ten of these engines at night.   Only three or four of these engines, however, operated continually in that part of the yard opposite Gowdy street, the balance of  them, being  assigned to  different locations— some working in South Nashville, some in West Nashville or New Town, some in East Nashville, and others north of the  Broad Street  Viaduct—would  only come into the terminal yards for a little while at a time, and at perhaps long intervals.

These three or four engines which  worked  opposite Gowdy street, and consequently opposite Mr. Lellyett's house, were engaged mostly in hauling passenger trains. They used about 400 to 500  bushels of  coal, in all, in twenty-four hours.

The evidence showed that the terminal yards began operations in  January or  February, 1900.   This suit was brought August 25, 1902, about thirty-two months after the terminals began operations.

During  this time,  according to Mr.  Lellyett's evidence, he had been absent from the city, with his family, from the middle of June to about the middle of September each summer.   Deducting these periods of time he was away, it would appear that he and his family were in their residence about twenty-four months.

The case was submitted to the jury under a charge of the court, and a verdict was rendered against the defendants for $4,000.   Under this charge, no damages were awarded for injuries to the fee, and all damages to the furniture were, at plaintiff's request, withdrawn. Hence this verdict must be taken as damage to the value of the use of the property, and other elements alleged in the declaration.

The defendants have appealed to this court, and assigned errors—twenty-nine in number.

The first error assigned is that there is no evidence to support the verdict.

Under this assignment it is insisted that the suit is brought in the name of Jno. T. Lellyett, trustee and next friend for Mary R., Mary Frances, and Catherine Lellyett; while there is nothing in the several counts and allegations to indicate that the suit is brought for the use and benefit of any one, except Jno. T. Lellyett, individually, and that the word, "trustee," annexed to his name, is merely *descriptio personae;* while the proof shows that the title to the property is in Jno. T. Lellyett, trustee, for the use and benefit of his wife and two children, the parties named in the summons; and hence there is a variance between the allegations and proof of title, which is fatal to the action.

We think this objection not well taken, and that it sufficiently appears that Mr. Lellyett was trustee for his wife and children, and the suit was brought for damages to the use of their property, health, and comfort.

The second assignment of error is that there is a mis-joinder of parties and causes of action.

The insistence is that there are five distinct and separate causes of action stated in the declaration, to wit:

First, a joint cause of action for damages to the real estate.

Second, a separate cause of action to Jno. T. Lellyett for damages to his furniture.

Third, fourth, and fifth, separate causes of action in favor of the wife and two children for injury to their health.

In regard to this assignment, it is only necessary to say that all claim for damages to personal property of Jno. T. Lellyett was abandoned, and the jury was so instructed, and this was not embraced as one of the elements of damages in the charge of the trial judge.

As to what are styled the third, fourth, and fifth causes of action, we think the assignment and criticism made is not well founded. There is no claim for damages for sickness, doctor's bill, etc. The allegation of impairment to health of family is merely a specification of the damage done the place as a home or place of residence, just as is the destruction of the grass, trees, shrubbery, etc., and the presence of smoke, cinders, etc.

In other words, the averment is directed to the damage to the use of the property, and this damage consists in its being rendered unhealthy, uncomfortable, and unsuitable for residence purposes.

114 Tenn—25

In the charge of the court the jury were not instructed to give any damages for sickness or impairment of health of any of the family, but it was omitted, and the jury could not have given any damages for sickness or impairment of health, separate and apart from the damage done the property as a comfortable, healthy, and suitable place of residence.

The damages for which recovery was directed to be given by the charge was "to the use, comfort, peace, quiet, and enjoyment of the house and lot," and health and sickness are not referred to in that part of the charge relating to the measure of damages.

We think, therefore, that there was no separate cause of action recovered upon for sickness or impairment of health.

We think it well to analyze the pleadings and see what issues are properly before us, and see whether there were issues submitted to the jury which were not warranted under the pleadings.

The first count in the declaration sues for permanent injury and impairment to the value of the premises of complainant.

So, with the fourth count, the damage claimed is to the permanent injury to the property.

Now, the court charged the jury, at plaintiff's request, that the plaintiff could not recover for the injury done the fee of the premises, and any proof adduced as to the value of the premises, if such there be, must be considered only determining the question as to whether

or not the comfortable use and enjoyment of the premises had been impaired or destroyed.

This instruction by the trial judge was made at the request of the plaintiff, but really it is immaterial whether the charge was given at plaintiff's request or on motion of the court.

This instruction eliminates the first and fourth counts, since they claim for permanent, and not recurrent, damages.

These two counts must be eliminated, therefore from our consideration, as not presenting the issues upon which the case was tried and damages found.

The second and fifth counts are for damages to the furniture and fixtures in the house, and these are eliminated because all claim for damages on this account was withdrawn by the plaintiff.

This leaves only the third and sixth counts not eliminated, and these counts claim damages for injury to the use and enjoyment of the premises as a home.

The third count states the wrongful act to be that the plaintiff's place has been changed from a quiet, restful home into an unhealthy, noisy, dirty, filthy place, which has greatly injured the health of plaintiff's family; and the sixth count states the wrongful act to be the injury and destruction of the health, peace, comfort, and happiness of the family; and upon these counts the verdict must be sustained, if at all.

The question before us is, therefore whether the use and enjoyment of the property of plaintiff has been ma-

terially impaired by the acts of defendants, and if so, are the defendants liable therefor?

There can be no question but that some detriment has been done to the use and enjoyment of the property. The evidence in the record leaves no ground for doubt as to this feature, but to what extent, we will consider more at length.

Defendants do not seriously contend that they are not the parties who have caused this damage, but the contention is that they are not liable for the same.

The argument is that the defendants have authority under their charters to locate the terminal yards, roundhouse, etc., where they have placed them, and, while the exact location of these things is not prescribed by the charter, the defendants had the legislative discretion to locate them where it would be most convenient to them and the traveling public.

Concede, for the sake of argument, that this is true (and within certain limitations it is), still the question remains, if such location results in material damage to adjacent or contiguous owners, are the defendant liable? And this proposition presents the real controversy so far as the merits are concerned.

While there are many criticisms of the charge so far as it relates to this question, they are crystallized in the exception to the following part of the charge:

"I instruct you that it is no defense to this action to prove that the yards where the business of defendants is carried on is at a suitable locality, or that the busi-

ness is a lawful business and one useful to the public, or that the best and most approved appliances and methods are used in the conduct and management of the business. Where a trade or business is carried on in such manner as to interfere with the reasonable and comfortable enjoyment of another of his property, or which occasions material injury to the property itself, it amounts to a wrong to the neighbor, and one for which an action will lie."

This portion of the charge is taken from the opinion of the court of chancery appeals in the case of *Ducktown, etc.,* v. *Barnes,* 60 S. W., 600, which was, as to its result, approved by this court, and to some extent followed in the case of *Swain* v. *Tenn. Copper Co.,* 111 Tenn., 437, 78 S. W., 93.

As further bearing directly upon the question of liability, and meeting the criticism of defendant's counsel, the court charged:

"I charge you, gentlemen, that, under the charter of the defendants and the contract with the city of Nashville, the State has not authorized the wrong complained of. In locating the yards and the various structures thereon so that injury necessarily resulted to adjacent landowners, the defendants acted at their peril. In locating the terminal yards the defendants stood on the footing of an individual, and were entitled to no superior rights of immunity by legislative authority. The authority to construct the yards did not authorize defendants to place them wherever they might think pro-

per in the city, without reference to the property rights of others. Defendants have no right to use the yards in disregard of the rights of others, and with immunity for their invasion.

"If you find from the evidence that the terminal yards are located in or adjacent to a residence neighborhood, and that in their operation the defendants make noises which, because of their volume, character, proximity, or unreasonableness, cause plaintiff material distress, discomfort, or injury, then, in that case, the defendants are liable. It is no defense that such noises are necessary to the operation of defendants' business, its location, manner in which it is conducted, the hours of its operation, character and volume of the noises, reasonableness or unreasonableness of the hours during which such noises are made, and all other attendant circumstances.

"I further charge you and instruct you, gentlemen, that neither is it any defense that when the nuisance was established it was in a convenient place, and that the public had come to the nuisance either by the extension of the town or the operating of highways and streets.

"The fact that the business was originally established in a convenient place, but that the public has come to it, is no defense."

The legislature may authorize public corporations and quasi public corporations to take private property for public use.

Thus, it may authorize a railroad to take private property for its right of way, for its depots and station houses.

It may also authorize terminal companies to take private property for its station houses, roundhouses, coal chutes, and other necessary conveniences; but it cannot authorize such public corporations, in locating such works, to seriously impair or destroy property not so taken, but which becomes impaired or is destroyed by the use of that which is taken.

There is no authority for the commission of a nuisance, or the doing of a hurtful act, to adjacent or contiguous property, in order to operate that which it lawfully has.

This question, we think, has already been decided in this State in a number of cases.

In *Terminal Company* v. *Jacobs,* 109 Tenn., 741, 72 S. W., 957, 61 L. R. A., 188, which involved the location and construction of a roundhouse by this same terminal company, it is said:

"To claim exemption from a liability, resting on a charter right, the answer may be properly made that the State has not authorized the wrong complained of, and, in locating its roundhouse so that the injury necessarily resulted to the adjacent landowner, it did so at its peril."

It appears to be the English doctrine that Parliament may authorize the construction of such a work at a specified place where its use would constitute a

nuisance at common law, and no compensation could be claimed in respect to an injury to private rights, apart from a negligent use.

But, even under the English system, no such immunity could be claimed, unless there was sanction to do so, either expressed or implied.

As is said in *Hill* v. *Managers of the Metropolitan Asylum Dist.*, L. R., 4 Queen's Bench Div., 433:

"When the terms of the statute are not imperative, but permissive, when it is left to the discretion of the persons empowered to determine whether the general powers committed to them shall be put in execution or not, I think the fair inference is that the legislature intended that the discretion be exercised in strict conformity with private rights, and did not intend to confer license to commit a nuisance in any place which might be selected for the purpose."

This court, approving this doctrine, said, in addition, in *Terminal Company* v. *Jacobs*, 109 Tenn., 743, 72 S. W., 957, 61 L. R. A., 188:

"But over and beyond this, we think this corporation, in selecting a place for its roundhouse, acted in a private capacity, and is responsible for the injurious consequences which may result from its use. This is the view taken in *Baseman* v. *Penn. R. R. Co.*, (N. J. Sup.), 13 Atl., 167. It is there said: 'A railroad, in selecting a place for repair shops and engine house, acts altogether in its private capacity. Such location is a matter of indifference to the public. Consequently,

with respect to such act, the corporation stood on the footing of an individual, and was entitled to no superior rights of immunity. . . The authority to construct such works did not authorize it to place them wherever it might think proper in the city, without reference to the property rights of others. Grants of power to corporate bodies like these can give no license to use them in disregard of the rights of others, and with immunity for their invasion.' To the like effect is the leading case of *B. & P. R. R.* v. *Fifth Baptist Church,* 108 U. S., 317, 2 Sup. Ct., 719, 27 L. Ed., 739; *Cogswell* v. *N. Y., H. & H. R. Co.,* 103 N. Y., 10, 8 N. E., 537, 57 Am. Rep., 701."

The *Fifth Baptist Church* case, which is a leading case upon this question, has been cited and approved in a large number of cases, and by all the text-books and compilations, since it was delivered in 1883.

It is said that it is weakened in the case of *London Railway Company* v. *Truman,* 11 App. Cas., 50, but we do not find this to be so; but that case, by the opinion of the court itself, is differentiated from the *Hill* case and the *Church* case, the *Truman* case resting upon the English railway acts, which were assumed to establish the proposition that a railway might be made and used, whether it was a nuisance or not.

The *Truman* case is contrary to the other cases, because it is based upon the authority of the English railway acts, which authorize the construction and operation of the railway, even though it be a nuisance. No

such legislation has ever been attempted in the United States, and it is so utterly repugnant to our constitution and system of government, by which the rights of every individual are protected, that it will never be attempted or upheld.

In the *Fifth Baptist Church Case*, 108 U. S., 317, 2 Sup. Ct., 719, 27 L. Ed., 739, it is said:

"It is no answer to the action of the plaintiff that the railroad company was authorized by act of congress to bring its track witin the limits of the city of Washington, and to construct such works as were necessary and expedient for the completion and maintenance of its road, and that the engine house and repair shop in question were thus necessary and expedient, that they are skillfully constructed, that the chimneys of the engine house are higher than required by the building regulations of the city, and that as little smoke and noise are caused as the nature of the business in them will permit.

"In the first place, the authority of the company to construct such works as it might deem necessary and expedient for the completion and maintenance of its road did not authorize it to place them wherever it might think proper in the city, without reference to the property and rights of others. As well might it be contended that the act permitted it to place them immediately in front of the president's house or of the capitol, or in the most densely populated locality. Indeed, the corpora-

tion does assert a right to place its works upon property it may acquire anywhere in the city."

"Whatever the extent of the authority conferred, it was accompanied with this implied qualification: that the works should not be so placed as by their use to unreasonably interfere with and disturb the peaceful and comfortable enjoyment of others of their property. Grants of privileges or powers to corporate bodies, like those in question, confer no license to use them in disregard of the private rights of others, and with immunity for their invasion. The great principle of the common law, which is equally the teaching of christian morality, so to use one's property as not to injure others, forbids any other application or use of the rights and powers conferred." 108 U. S., 317, 2 Sup. Ct., 727, 27 L. Ed., 744.

And again, page 745 of 27 L. Ed., page 729 of 2 Sup. Ct., 108 U. S., 317:

"The acts that a legislature may authorize, which without such authorization would constitute nuisances, are those which affect public highways or public streams, or matters in which the public have an interest, and over which the public have control. The legislative authorization exempts only from liability to suits, civil or criminal, at the instance of the State; it does not affect any claim of a private citizen for damages for any special inconvenience and discomfort not experienced by the public at large."

And again, page 745 of 27 L. Ed., page 730 of 2 Sup. Ct., 108 U. S., 317:

"If, as asserted by the defendant, the noise, smoke, and odors which are the cause of the discomfort and annoyance to the plaintiff are no more than must necessarily arise from the nature of the business carried on with an engine house and workshop as ordinarily constructed, then the engine house and workshop should be so remodeled and changed in their structure as to prevent, if that be possible, the nuisance complained of, and, if that be not possible, they should be removed to some other place, where by their use the plaintiff would not be thus annoyed and disturbed in the enjoyment of its property. There are many places in the city sufficiently distant from the church to avoid all cause of complaint, and yet sufficiently near the station of the company to answer its purposes."

To the same effect is the case of *Chicago, Gr. W. R. Co.* v. *Methodist Church*, 102 Fed., 85, 42 C. C. A., 178, 50 L. R. A., 488, citing *Stevens* v. *New York Elev. R. Co.*, 8 N. Y. Supp., 313; *Lahr* v. *Metropolitan Eve. R. Co.*, 104 N. Y., 268, 10 N. E., 528; *Kane* v. *New York Elev. R. Co.*, 125 N. Y., 186, 26 N. E., 278, 11 L. R. A., 640; *Drucker* v. *Manhattan R. Co.*, 106 N. Y., 157, 12 N. E., 568, 60 Am. Rep.,437; *Dunyckinck* v. *New York Elev. R. Co.*, 125 N. Y., 710, 26 N. E., 755; *Cogswell* v. *New York, N. H. & H. R. R. Co.*, 103 N. Y., 10, 8 N. E., 537, 57 Am. Rep., 701; *Peyser* v. *Metropolitan Elev. Co.*, 13 *Daly*, 122; *Smith* v. *New York Elev. R. Co.*, 18 N. Y.

Supp., 132; *Bohm* v. *Metropolitan Elev. R. Co.*, 129 N. Y., 576, 29 N. E., 802, 14 L. R. A., 344.

The same doctrine is laid down in *Cum. Tel. Co.* v. *United Electric Ry. Co.*, 93 Tenn., 492, 29 S. W., 104, 27 L. R. A., 236. In that case this court quoted approvingly the case of *Hudson River Tel. Co.* v. *Turnpike Co.*, 135 N. Y., 393, 32 N. E., 148, 17 L. R. A., 674, 31 Am. St. Rep., 838, which said:

"We are not prepared to hold that a person, even in the prosecution of a lawful trade or business upon its own land, can gather there, by artificial means, a natural element like electricity, and discharge it in such volume that, owing to the conductive properties of the earth, it will be conveyed upon the grounds of his neighbor with such force and to such an extent as to break up his business or impair the value of his property, and not be held responsible for the resulting injury."

Again on pages 520, 521, of 93 Tenn., page 111 of 29 S. W. (27 L. R. A., 236):

"The important consideration is that a thing of value has been taken from the plaintiff for the benefit of defendant as the representative of the public, and for that thing compensation must be made. It is a plain dictate of justice that the public, not the individual citizen should bear the burden imposed upon the private property for the public benefit. That defendant's acts may have been authorized and lawful can make no difference. The legislature has not the power (except, perhaps, as to corporate franchises) to authorize, and in this case

it has not undertaken to authorize, the taking of private property for a public use without compensation."

In *Booth* v. *Ry.*, 140 N. Y., 272, 35 N. E., 593, 24 L. R. A., 105, 37 Am. St. Rep., 552, it is said:

"But while there are decisions which give counten-ance to the view that an authority conferred upon a rail-road corporation to construct a railroad, carries with it immunity from liability in executing the work for con-sequential damages to private property, to the same ex-tent as pertains to the soverign in executing public works (*Bellinger* v. *N. Y. C. R. R. Co.*, 23 N. Y., 42), it is now the settled doctrine in this State that the pow-ers granted to such corporations are to be construed as privileges conferred, but upon the understanding that they shall be exercised in strict conformity to private rights, and under the same responsibility as though the acts done in execution of such powers were done by an individual. *Cogswell* v. *N.Y., N. H. & H. R. R. Co.*, 103 N. Y., 10, 8 N. E., 537, 57 Am. Rep., 701. This doctrine accords with reason and with the presumed intention of the legislature. The franchises of a railroad corpora-tion are conferred in consideration of supposed public benefits which will result from the construction of its road. The projectors of such an enterprise are moved by considerations of personal advantage. To acquire corporate character and privileges, they are willing to subject themselves to certain public duties. But it is quite unreasonable that in executing its corporate pow-ers the corporation should be exempted from liability

for injuries to private property, as though it was acting as a strictly public agent."

See, also, *Long Island Ry. Co.* v. *Garvey,* 159 N. Y., 334, 54 N. E., 60.

In *Madison* v. *Ducktown, etc., Co.,* 5 Cates, 331, 83 S. W., 658, noxious fumes and smoke were found to be sufficient to constitute a nuisance. With reference to location and operation the court (page 342, p. 660, 83 S. W.) said:

"The court of chancery appeals finds that the defendants are conducting and have been conducting their business in a lawful way, without any purpose or desire to injure any of the complainants; that they have been and still are pursuing the only known method by which these plants can be operated and their business successfully carried on; that the open-air roast heat is the only method known to the business or to science by means of which copper ore of the character mined by the defendants can be reduced; that the defendants have made every effort to get rid of the smoke and noxious vapors, one of the defendants having spent $200,000 in experiments to this end, but without result." ·

"It is to be inferred from the description of the locality that there is no place more remote to which the operations referred to could be transferred."

And again (page 358, page 664 of 83 S. W.) :

"A judgment for damages in this class of cases is a matter of absolute right, where injury is shown."

In view of these and many other authorities, we are

of opinion that there was no error in the charge of the court, as claimed by the defendants, except as hereinafter indicated.

It remains to apply the principles laid down as determining liability to the facts of this case, with such criticisms and modifications as we think are proper under the facts.

As before stated, tracks were laid in front of the property in controversy, and about 225 feet from it, as early as 1851 or 1852, and the entire traffic and travel of the Nashville, Chattanooga & St. Louis Railway and Louisville & Nashville Railroad to and from the South passed over these tracks. With the increase of travel and traffic the cars have been caused to pass more frequently than when the roads first commenced operations; and other tracks have been laid entering into the terminal station, and passing through it, in order to accommodate the increase.

When the first tracks were laid, the property now in controversy, as well as that contiguous, was vacant. With the growth of the city this space has been occupied and residences have been erected.

Thus both the travel and traffic of the roads, as well as the growth of the locality, have gone hand in hand.

We are of the opinion that, in so far as the growth and increase of travel and traffic into and through the station has brought discomfort to plaintiff, he is without remedy.

In other words, the roads have the right to accom-

Terminal Co. v. Lellyett.

modate their increasing traffic and travel without lia-
bility, so long as their trains are operated without neg-
ligent disregard of the comfort and usable value of the
plaintiff's property, and for this purpose to lay such ad-
ditional tracks, side tracks, and switches into and
through the station as may be required to accommodate
such travel and traffic, both passenger and freight; and
it is only for the additional conveniences of roundhouses
sandhouses, coal bins, coal chutes, and the switchyards
and tracks necessary to operate such additional conven-
iences, which might be located elsewhere, though not so
advantageously, perhaps, that plaintiff can complain, if
they materially damage the plaintiff's property.

There has been no effort made to distinguish between
the damage caused by the entrance of trains and passing
of trains and exit of trains from the station and switch-
ing trains in operating the road, and the operation of
the switch tracks, the coal bins, coal chutes, roundhouse,
sandhouse, and other facilities introduced and operated
as part of the terminal facilities.

It is only for the latter that plaintiff has a right of
action, and proof should have been confined to that fea-
ture of the situation, and not to the general discomfort
and damage caused by the entering and departure of
trains from the station, as well as the operation of the
other facilities.

Again it is not every inconvenience or discomfort that
will entitle a property holder to damages, even though

114 Tenn—26

it be material or considerable, and especially as against a public or quasi public enterprise.

The noise of paved streets and of street cars is a material discomfort to abutting owners. The smoke from factories, hotels, and manufacturing establishments may form a material discomfort and annoyance to persons living near by; but these are discomforts and annoyances that the individual must bear in deference to the convenience and comfort of the public.

The noise of trains passing through the country districts and the dust of vehicles passing along the public highways may be a great annoyance to residents along the line of such roads; and the rumbling of carriages of belated revelers and of early market wagons along the paved highways may disturb the slumbers and harass the nerves of persons who desire to sleep in the cities; but it is not for such annoyances and discomforts that the law allows redress, but only where the discomfort and inconvenience proceeds to such an extent as to injure the usable and rental or permanent value of the property that the law will award damages. It must amount, to some extent, to the taking of the value of the property, either temporary or permanent, and depriving the owner thereof. See *R. R.* v. *Bingham,* 87 *Tenn.,* 522, 11 S. W., 705, 4 L. R. A., 622; *Demarest* v. *Hardham,* 34 N. J. Eq., 469.

This distinction will, we think, tend to harmonize to a large extent cases which appear to be, and are, no doubt, somewhat in conflict with the cases we have cited.

In other words, there are cases, some of them cited by

counsel, which seem to hold that damages · will not be
awarded when they arise from the careful operation of
lawful enterprises; but these cases, when carefully an-
alyzed, do not present such a strong state of facts as
shows a material injury to the property, amounting to
a taking of it in part or in whole; but they present cases
where the inconvenience and damage do not amount to
a nuisance, and, hence, being done in the prosecution of
a legal, public business, they do not present a case for
damages.

The liability of defendants is, we think, to be determ-
ined by the principles we have laid down; and it remains
to consider the question of damages, if there is liability.

· One assignment of error is that the damages are so
excessive as to indicate passion, prejudice, or caprice.

In our opinion, there are two theories upon which
damages might be estimated or based, if there is liabil-
ity.

One is the theory that the defendants are carelessly
and negligently operating their property so as to make
it an unnecessary and unwarrantable and hurtful nui-
sance, while at the same time they have it in their power
to errect the evils and obviate the trouble by adopting
other means, and being more careful in the manner of
operating the yards; and coupled with this, is the pre-
sumption that the nuisance will be only temporary, and
the evil will be remedied.

In that aspect of the case recurrent damages to the

use and enjoyment of the property may be recovered from time to time until the nuisance is abated.

In such case the measure of damages will be the injury to the value of the use and enjoyment, which may be measured, to a large extent, by the rental value of the property, and to what extent that rental value is diminished.

The other theory is that the yards, etc., are carefully and properly operated, so much so as can be done considering the use of the property; but the location of the yards, etc., and their proper operation nevertheless causes an actionable injury to the plaintiff's property. In such case it is not contemplated that any change in operation will be made, and the damage will continue so long as the yards are continued, which will be permanent.

In such case the proper measure of damages will be the injury to the fee or permanent value of the property by the continued and permanent operation of the yards. To the extent that such permanent injury is inflicted, the property is, in a sense, taken or appropriated.

The doctrine of successive suits rests upon the following principles:

(1)    That the act complained of is a nuisance.

(2)    That it may be abated or discontinued, and until that is done damages may be recovered from time to time.

This assumes that the nuisance will be abated, and

that the cause of the injury is not permanent, nor intended to be so.

On the other hand, when the operation of the yards is lawful and reasonable, and the injury results from the location and necessary operation, and it is not contemplated to be removed or capable of being removed, then the damages are permanent, and they should be estimated on the permanent injury to the property in the depreciation of its value in the market.

Now, upon this feature the measure of damages in the record is in a very unsatisfactory condition.

The declaration in its different counts claims damages upon each theory; that is, some of the counts for damages for use and occupation, and others for damages to the value of the property. There were other counts alleging damages to the furniture.

Much proof was taken showing damages in a general way—that is, injury to the property, both real and personal; but there is very little, if any, estimate of salable value, and none of rental value or rental depreciation. It is not shown how much the rental or usable value has been diminished. It is not shown, in definite estimates, how much the permanent value of the property has been depreciated.

The case was presented to the jury upon all the counts; that is, permanent damages, to the property, temporary damages to the use, and damages to the furniture.

But when the court came to charge the jury all claims

for damages to furniture were withdrawn; all claims for damages to the fee or permanent injury . were, at plaintiff's request, withdrawn; and the case went to the jury alone upon the question of damages to the use and occupation—that is, to the rental or usable value of the real estate.

It must have been confusing to the jury to have the matter submitted to them in this way, requiring them to · eliminate from their minds the damage to the personal property, and the permanent damage to the realty, and to consider only the injury to the rental value.

There is almost, if not an entire, absence of any basis for an estimate of the depreciation of the property in rental or usable value.

It was shown in the proof, over protest, that the value of the real estate was $7,000. This was for the purpose of furnishing a basis for its rental or usable value, and was so confined; the argument being that the injury to the rental or usable value of $7,000 would be more than that of a $2,000, or less than of a $20,000.

In this condition of the record it is not improbable that the jury were misled into believing they could look to the injury to the personal property and the permanent injury to the property, whereas they could only look, as the case was finally submitted to them, to the damage to the use and enjoyment of the real property during the time the terminal property was being operated; that is, from January, 1900, to the bringing of the suit in 1902. This was a period of about thirty-two months, during

about six of which plaintiff did not occupy the premises; but was away voluntarily for the summer.

The damage found was $4,000. This, for the use of a property worth $7,000, for only 32 months, would be grossly unreasonable for rental or usable value, even if the property was rendered uninhabitable.

It would be at the rate of $2,000 per year for a property which, from its value, would, perhaps, rent for not more than $600 per annum. .

So that, if the plaintiff had lost the entire use or rent of his property, the amount found as damages therefor was grossly excessive, even taking into consideration, in addition to the rental, the destruction of the trees, flowers, shrubbery, etc.

Treating the case, as we must, upon the record, that only temporary damages were awarded, they are so excessive as to indicate either misapprehension by the jury or showing passion, prejudice, or caprice on their part, which must vitiate their verdict.

We have not been able to find in the record any evidence of the rental or usable value of the property.

There is no evidence to show what the property would have rented for before the terminal plant commenced operation, nor how much, if any, that rental value had been diminished.

. Nor is there any evidence or estimates in figures of the permanent injury to the property, if that was to be considered.

Evidence was introduced to show that smoke, soot,

cinders, dust, and noise were caused by other industries than those of the terminal company.

In regard to the several assignments on this feature of the case we are of opinion that it was competent to show that the property in controversy was injuriously or prejudicially affected by smoke, dust, cinders, etc., from other sources, but not to show the effect of same on property near by or contiguous to the plaintiff's property.

Neither is it competent to show how other property contiguous to or near by that of plaintiff has been affected by the installation of and operation of the terminal plant, but the proof should be confined to the premises of plaintiff.

Nor is it competent to compare the noise existing at plaintiff's residence with that prevailing in other portions of the city; nor to show that Nashville, generally, is a dirty, smoky, noisy place or city.

Other minor errors are assigned, which it is not necessary to pass on specifically.

For the reasons we have indicated, the judgment of the court below must be reversed, and the cause remanded for a new trial. Appellee will pay costs of appeal.

Upon this new trial plaintiff should elect whether he will claim for temporary recurrent damages to his property in its use and rental value, or whether for permanent injury, and proof should be confined accordingly. So, also, all evidence as to damages to furniture

Terminal Co v. Lellyett.

should be eliminated, and not put before the jury.  So, also, should the proof be limited to the damage caused by the operation of the  roundhouse,  sandhouse,  coal chutes and bins, and the tracks used in operating the same, excluding such inconvenience and  damage  as arises from the operation of incoming or outgoing passenger and freight trains into the station, and the operation of such  switches as  are  required to  handle the same in entering or leaving the station.  All other matters should be excluded from the  jury  as  tending  to confuse them.

In the present state of the  record,  we  cannot  say whether defendants are liable for any amount.