·Southern Ry. Co. *v.* D. A. Fisher.

(*Jackson.* April Term, 1918.)

1. **RAILROADS.** Maintenance of nuisance. Operation of tracks. Test of liability.

The true test of liability of a railroad company for the maintenance of a nuisance in the way of switch tracks is whether the company was acting in its private capacity, as distinguished from its public function, when operating the claimed nuisance. *Post, pp.* 434,435.)

Case cited and approved: Louisville & N. Terminal Co. v. Jacobs, 109 Tenn., 727.

Case cited and distinguished: Louisville & N. Terminal Co. v. Lellyett, 114 Tenn., 368.

2. **RAILROADS.** Maintenance of nuisance. Switchyards.

A railroad company is liable to a neighboring landowner as for the maintenance of a nuisance in the operation of divisional switchyards not maintained in connection with station grounds, and the switching not being confined to the making and breaking up of trains, the yards being operated as part of the private functions of the railroad. (*Post, pp.* 435-437.)

Cases cited and approved: Matthias v. Minneapolis, etc., R. Co, 125 Minn., 224.

FROM SHELBY.

Appeal from the Circuit Court of Shelby County to the Court of Civil Appeals, and by *certiorari* to the Court of Civil Appeals from the Supreme Court.— Hon. Ben L. Capell, Judge.

CARUTHERS EWING and EARL KING, for plaintiff in error.

WILSON & ARMSTRONG, for defendant in error.

MR. JUSTICE WILLIAMS delivered the opinion of the Court.

This suit grows out of the construction and maintenance by the railway company of its Forrest Terminal Yards, located just east of the eastern city boundary line and about six miles from the company's depots in the city of Memphis, which city is the western terminus of the company's extensive system of railways in this State. These yards are something above one mile in length, with a width of about two hundred and fifty feet at a point opposite the property of Fisher, plaintiff below.

Fisher was the owner of a parcel of realty fronting six hundred and fifty feet on Southern avenue, which highway intervened between his holding and the railway right of way. On this parcel he had erected a suburban residence, about one mile east of the city boundary line, and when the terminal yards were constructed the same extended a short distance to the east of this residence. A roundhouse in the yards is about three thousand nine hundred feet from Fisher's house, a coal chute about four thousand seven hundred feet, and the nearest fixed structure approximately one-half mile. In front of the residence is a series of about seventeen railroad tracks, one being the main

line track and the others used for the purpose of making up freight trains, parking cars and work trains, etc. These tracks, or some of them, are also used to get engines into the roundhouse and sandhouse, and rolling stock to the coal chute.

In one of the counts of the declaration damages were sought to be recovered on account of the lessening of the permanent value of plaintiff's property by reason of the conditions produced by the defendant in the operation of the yards; noise, smoke, cinders, gases from the low-grade coal used in the engines, etc., amounting to a nuisance, according to the averments of the declaration.

The trial judge charged the jury as follows:

"If you find from a preponderance of the evidence that after the yards were constructed, and the defendant begun its operations in the yards, that the manner in which the operations were conducted in that the noise of switching operations, blowing of whistles and ringing of bells, smoke, soot, cinders, resulting from the use of the terminal yards, popping of cars and jarring of the residence from switching operations in the yards and other noises attendant upon the use of the yards, because of their volume, proximity and character caused plaintiff material distress, discomfort, or injury, and that the permanent value of plaintiff's property was materially decreased or damaged, then you will find for the plaintiff.''

The railway company does not controvert that it is liable for damages inflicted by reason of the operation of fixed structures, such as the roundhouse, coal chute, etc., and of engines or cars thereto, but contends that there is no liability because of the necessary and non-negligent switching operations in the making up and breaking up of trains in the yards.

A verdict and judgment for $6,000 was the result of the trial in the circuit court; and on appeal the court of civil appeals affirmed the judgment, though there was a division of the judges on the point of the soundness of the above contention of defendant company as to such switching operations.

Abandoning all other questions, the railway company has reduced its contention in its petition for *certiorari* to a single point: That the switching of cars incident to breaking up and making up trains is the discharge by it of a public duty, which duty requires that this be done with as little delay as practicable and at such proximity to its freight and passenger stations as will not unduly delay the performance of other duties owed the public by it as a common carrier. It is sought to distinguish such engine and car movements in the terminal yards, as being the exercise of a necessary public function, from the operation of fixed structures and movements of rolling stock to and from same, which are admitted to be referable to the private capacity or powers of the company, with consequent liability therefor

upon its part even though the operation be non-neg-ligent.

Counsel of both parties rely upon *Louisville & N. Terminal Co.* v. *Lellyett,* 114 Tenn., 368, 85 S. W., 881, 1 L. R. A. (N. S.), 49, and the language of certain paragraphs of that decision would at least seemingly tend to support the respective insistences. In the Lellyett Case, it was held that damage caused by the entrance and exit of trains from the station and switching trains in operating the road should be segregated and distinguished from the operation of switchyards and fixed structures.

The railway company, relies upon this paragraph of that decision, particularly the italicized words:

"The roads have the right to accommodate their increasing traffic and travel without liability, so long as their trains are operated without negligent disregard of the comfort and usable value of the plaintiff's property, and for this purpose to lay such additional tracks, side tracks, and switches into and through the station as may be required to accommodate such travel and traffic, both passenger and freight; and *it is only for the additional conveniences of roundhouses, sandhouses, coal bins, coal chutes,* and the switchyards and tracks necessary to operate *such additional conveniences,* which might be located elsewhere, though not so advantageously, perhaps, that plaintiff can complain, if they materially damage the plaintiff's property."

Upon this excerpt is based the defendant's argument that train-making switching must be excluded.

Plaintiff Fisher relies upon the following paragraphs immediately following the above in the same decision:

"There has been no effort made to distinguish between the damage caused by the entrance of trains and passing of trains and exit of trains from the station and switching trains in operating the road, and the operation of the switch tracks, the coal bins, coal chutes, roundhouse, sandhouse, and other facilities introduced and operated as part of the terminal facilities.

"It is only for the latter that plaintiff has a right of action, and proof should have been confined to that feature of the situation, and not to the general discomfort and damage caused by the entering and departure of trains from the station, as well as the operation of the other facilities."

On these paragraphs the argument is based that the operation of switch tracks, in terminal yards proper, away from the station, for whatsoever purpose, may be looked to in estimating plaintiff's damages.

The language of the court in the Lellyett Case is apparently ambiguous, due in a measure to the fact that the terminal yards and the station grounds or yard there involved were in part identical or lay side by side. In the instant case, the terminal yards are over five miles distant from the defend-

140 Tenn.—28.

ant's depots in the city. The question is one of much importance, since by far the greater damage has accrued to plaintiff from the switching of cars in the making up and breaking up of trains for transportation trips over the division. As noted, the fixed structures in the yards are not near the home of the plaintiff.

The true test for distinction between cases of liability and nonliability of a railway company for the maintenance of a nuisance in the way of switch tracks is: Was the company acting in its private capacity, as distinguished from its public function, when operating the claimed nuisance? *Louisville & N. Terminal Co.* v. *Jacobs,* 109 Tenn., 727, 72 S. W., 957, 61 L. R. A., 192.

If the operation of the tracks for any of the purposes to which they are devoted may be attributed to the corporation's public functions, then whatever consequential annoyance may necessarily follow from the shifting of cars with reasonable care is *damnum absque injuria,* since the inconvenience of private individuals must be suffered for the public accommodation.

It is not always easy to determine in a given case where the one function ends and the other begins; but the tendency of the later decisions is to classify terminal yards with coaling stations, roundhouses, etc., as falling within the private functions of the corporation, which, while incidental to duties of a public character, do not as to manner and place of

exercise directly concern the public. The location of such a yard admits of a wide latitude in the choice of sites, and the inclination of the courts is against immunity from liability for the results of non-negligent nuisances committed in and about them. 20 R. C. L., p. 454.

Holding in mind throughout that we are concerned with a yard that is not operated as a part of or in connection with station grounds, in order that the ruling to be made may not be construed as having application to switching operations thereon, we hold that the court of civil appeals properly affirmed the judgment of the circuit court. For reasons:

(a) The yards here in question are divisional yards, in which the switching is not confined to the traffic of the Memphis station, as one of many constituent units of the division; and the tracks in it are not devoted principally to the business of that station when cars are separated or combined in the making up of trains. Thus there is focused at one point and imposed on one neighborhood a burden that is peculiarly special, perhaps not borne by any other on the division.

(b) The location of the yards was one made at the option and in the discretion of the railway company; no considerations of public convenience, operative where depots are to be located, were imposed. In a case involving a switchyard proper, on which it seems there were no other terminal facilities, such as coal chutes, roundhouse, etc., it was said:

"Their location and operation is of no public concern, except as indirectly affecting the transportation problem. In selecting a place for these, the railroad acts as an individual attending to his private business and must be responsible as such for injuries to the property rights of others flowing from such selection and subsequent operation. In other words, in the location and operation of these incidental transportation facilities the railroad company has a free hand and may not shield itself from responsibility for damages to others behind and rule of public necessity or authorization by law. It is different from freighthouses and yards for receiving and delivering carload shipments. Public necessity, and sometimes statutes, demand that such be located for public convenience." *Matthias* v. *Minneapolis, etc,* *R. Co.,* 125 Minn., 224, 146 N. W., 353, 51 L. R. A. (N. S.), 1017, citing and quoting from *Louisville & N. Terminal Co.* v. *Lellyett,* supra.

(c) In the making up of trains at a station, as well as in traffic switching, it may be that a nearby owner of property might not be held to be in a position to recover damages. We have no such case to decide. If so, it might be said that he would then receive a reciprocal benefit in the advance in values which attend the location of depots. No such benefit mitigates the disadvantages and inconveniences suffered by plaintiff Fisher, whose premises are damaged without any prospect of his being able to sell same for use in the construction of wholesale houses,

Southern Ry. Co. v. Fisher.

warehouses, etc., which usually grow up around freight stations.

The case made by the railway company is a border-line one. We confess that we have reached the indicated conclusion after hesitation; but, for the reasons set forth, we are constrained to direct the entry of a judgment of affirmance.