## Richmond.

### KILLAM V. NORFOLK AND WESTERN RAILWAY COMPANY.

#### March 21, 1918.

1. PUBLIC SERVICE CORPORATIONS—*Private or Public Capacity.*—A public service corporation may act in a private capacity, as distinguished from its public capacity.

2. EMINENT DOMAIN—*Public Service Corporations—Public Capacity.*—If a public service corporation in locating, constructing or changing the construction, and in the operation of its works, acts in its public capacity, general legislative authority given it so to do, when strictly pursued, unless that authority is limited or annulled by constitutional provision (whether the provision of the Virginia Constitution of 1902 on the subject of private property being damaged for public uses without just compensation does or does not so limit such authority, it was not necessary to determine in the instant case), will be construed to confer on the corporation immunity from all liability for damages, not imposed by statute law, for such location, construction, change of construction, and operation. Such immunity is inseparably attendant upon the sovereign right of eminent domain which the legislature exercises untrammelled and unabridged, save only as it may be restrained by the Constitution, and it will be construed to be conferred on such a corporation by necessary implication by general legislative enactment on the subject where the corporation acts in its public capacity. In such case the harsh rule of *damnum absque injuria* applies in bar of all suits against the corporation for damages not allowed by statute.

3. EMINENT DOMAIN—*Public Service Corporations—Private Capacity.*—When a public service corporation acts in its private capacity, mere general legislative authority to establish, locate and operate its works will not confer upon it immunity from liability for damages resulting from a construction and operation of such works which would have been deemed a private nuisance at common law.

4. EMINENT DOMAIN—*Public Service Corporations—Private Capacity.*—If such works were not constructed for the very public duties for which the public service corporation was incorpo-

rated, but as incidental, adjunctive or appurtenant thereto merely, however necessary to the performance of the former duties, their operation will be considered and classed as an operation by the corporation in its private capacity. In such case the rule *sic utere tuo ut alienum non laedas* applies and controls the construction of the legislative enactment. The general legislative authority to locate, construct and operate the latter character of works will not be construed by implication to confer the immunity from liability for damages, and the harsh rule of *damnum absque injuria* has no application.

5. EMINENT DOMAIN—*Railroads—Nuisances—Switch Yards, Repair Shops or Terminal Plant.*—When railroad appurtenances, such as a round house, *switch yards*, repair shops or *terminal plant*, cause a nuisance to neighboring property by reason of noise, smoke, cinders, vibration, etc., there may be a recovery, where the switch yard operation complained of does not serve a passenger station or freight depot, so that such operation is not required of the railroad company in the discharge of its public duty in connection with such station or depot.

6. RAILROADS—*Nuisances—Terminal—Case at Bar.*—In the case at bar plaintiff instituted an action at law against defendant for damages alleged in the declaration to consist of the diminution of the market and rental value of certain land, dwelling house and other buildings thereon, located near defendant's terminal yard. It appeared that the tracks on such yard near to plaintiff's property were practically level when the dwelling house was erected and served as tracks for the reception, storing and retraining of cars, and that the damages were caused by a change of construction and operation by defendant of that portion of its tracks which were on the part of the terminal yard near to plaintiff's property. The change complained of was the construction of a large embankment, called a "hump," passing plaintiff's property and laying tracks thereon, and the propelling of trains of coal cars by engines other than those that brought the cars to the terminal yard up the grade by the plaintiff's property, causing loud noises, vibrations of the dwelling house and vast volumes of smoke, cinders, ashes and gases.

*Held:* That the new construction and operation of the part of the terminal yard complained of was but an operation merely incidental to the duties of the defendant which it performed in its public capacity.

7. RAILROADS—*Nuisances—Terminal—Switching Operation—Case at Bar.*—The change of method of operating the terminal yards in the instant case consisted, in ultimate fact, in withdrawing

the two tracks ascending the rising grade of the "hump" or embankment from their prior function of serving in part as tracks "for the reception, storing (and) retraining" of cars; and the subsequent use of such tracks for the "transportation" of cars of coal; but such transportation was essentially a rehandling—a retraining—a switching yard transportation. Such "transportation" of such cars necessarily occurs in all handling of through freight in switch yards. It was, in ultimate fact, a switching operation.

Error to a judgment of the Circuit Court of city of Norfolk, in an action of trespass on the case. Judgment for defendant. Plaintiff assigns error.

*Reversed.*

## STATEMENT OF THE CASE AND FACTS.

This is an action at law by the plaintiff in error (hereinafter referred to as plaintiff) against the defendant in error (hereinafter referred to as defendant) for damages alleged in the declaration to consist of the diminution of the market and rental value of certain land, dwelling house and other buildings, etc., thereon, located near the defendant's terminal yard at Lambert's Point. It is alleged that the tracks on such yard near to plaintiff's property were practically level when the dwelling house was erected, and that such damages were caused by the following alleged change of construction and subsequent operation by defendant of that portion of its tracks which are on the part of the said terminal yard near to plaintiff's said property, namely: that (as alleged in substance in the first count of the declaration) the defendant within five years before the bringing of this suit constructed a large embankment, called a "hump," commencing at a point about one-sixth of a mile eastwardly from plaintiff's property and rising in a westerly direction at a very steep grade until it has passed said property; that

upon said embankment as it rises there was laid a double track railroad; that such embankment is in close proximity to the plaintiff's dwelling house and the land on which it is located all owned by plaintiff; that such embankment is twenty feet high opposite plaintiff's property and continues to rise for a considerable distance westwardly beyond the same; that when defendant's trains of coal cars reach said terminal yard, they are broken up, and cars, in trains of about twenty, are propelled by engines employed for the purpose (being other engines than those which brought the trains into the terminal yard) up the grade of said "hump" and are so disposed of, in a yard provided for the purpose just beyond the summit of the "hump," that they may be thence propelled by gravity to a point in said terminal yard where appliances are provided for the purpose of transferring the coal into other cars, into which latter cars the coal is transferred and thence moved to vessels awaiting same at the piers, into which vessels the coal is then loaded; that daily since said embankment was erected the operation of the defendant of its tracks thereon, day and night, continuously, to the extent of forty trains a day, in the transportation of coal cars up said grade along by the plaintiff's property, has been such that because of such grade and the unusual amount of power required to propel said trains of coal cars up said grade (steam locomotives of very great power, using bituminous coal, being employed for that purpose), that, in such locality of the plaintiff's said property, "unusual, prolonged and very loud and annoying noises and vibrations of the dwelling house on said lot have been produced, which vibrations caused the plastering on the ceilings and side walls of it to crack and fall, and vast volumes of smoke, soot, cinders, ashes and gases were discharged from said locomotives and coal dust has been shaken and blown from said cars which fall upon said premises of the

plaintiff, blackening and rendering dirty and unsightly the houses, fences, trees and shrubs thereon and entered the said dwelling house, settling upon the interior and the occupants (when occupied) and the contents thereof, and soiling the floors, walls, ceilings, doors, windows, furniture, furnishings, clothing, bedding, curtains, table coverings, food and other articles therein, the same being accompanied by foul, offensive and noisome odors which taint and corrupt the atmosphere; that damage and injury of the same nature, though less in degree, was and is done to plaintiff's said property by said trains of cars and locomotives returning over the tracks on said embankment; that the conditions whereof plaintiff * * * complains are of a permanent nature and will continue indefinitely: all of which have rendered the said dwelling house and premises, unclean and uncomfortable, unhealthy, undesirable and unfit for habitation and have damaged the plaintiff's said property and made it impossible to obtain and retain tenants and caused a considerable loss of rent and great depreciation in the market and rental value of the same."

The count of the declaration mentioned alleges a common law nuisance and is substantially the same as the declarations in the *Townsend* and *Terrell Cases* referred to in the opinion below.

The declaration is in two counts. The other count is substantially the same except that it omits the allegation of damages caused by the return of the trains of cars and locomotives over the tracks on the embankment and it alleges no loss of rental, but only depreciation of the market and rental value of the plaintiff's property and claims the *just compensation* therefor guaranteed by our State Constitution.

The defendant filed a special plea to the declaration, setting up the defense of legislative privilege—claiming (in substance) immunity from any liability to the plaintiff for

damages on the ground that its acts complained of by the plaintiff were all done under legislative authority contained in its charter and in the charter of the Norfolk Terminal Company its predecessor in title, in strict conformity therewith and with due care and skill.

Omitting the formal parts, such special plea is as follows:

"(1) By act of the General Assembly of Virginia, approved March 17, 1851, the Norfolk and Petersburg Railroad Company was chartered, with authority to construct and operate a railroad, with steam as a motive power, from the city of Norfolk, Virginia, to the city of Petersburg, Virginia, and pursuant thereto, a line of railroad was constructed and has been continuously so operated by said company except that by successive charters, purchases, mergers and consolidations, all enacted or authorized by the General Assembly of Virginia, the said railroad has from the year 1896 down to the present date been owned and continuously operated, with steam as a motive power, by this defendant.

"(2) By act of the General Assembly of Virginia, approved March 6, 1882, the Norfolk Terminal Company was chartered and authorized to construct and operate a railroad, with steam as a motive power, from any point on the lines of the Norfolk and Western Railroad Company, in the county of Norfolk, Virginia, to any point or points on the Norfolk harbor or Chesapeake Bay, and to operate such railroad in conjunction with other railroads, and transport freight and passengers along its lines as a common carrier, and to construct, maintain and use piers for the delivery of freight to connecting water carriers.

"(3) By said act said Terminal Company was authorized to consolidate with the Norfolk and Western Railroad Company.

"(4) By articles of consolidation executed October 16, 1889, the Norfolk Terminal Company was consolidated with the Norfolk and Western Railroad Company.

"(5) The entire property and corporate franchises, powers and privileges of the Norfolk and Western Railroad Company, including all the property and corporate franchises, powers and privileges of the *Norfolk Terminal Company*, were sold by order of the United States Circuit Court for the Eastern District of Virginia, and said sale confirmed by decree of said court entered September 19, 1896, and that by an act of the General Assembly of Virginia, approved January 15, 1896, it has been provided that whoever might become the purchaser of said property, franchises, powers and privileges in the cause then pending in said court should be constituted a corporation under such name as they should select, and vested with title to said property, franchises, powers and privileges, and that said purchasers thereafter adopted in due form the name of the Norfolk and Western Railway Company.

"(6) That on the      day of      , 1888, the ground upon which the tracks referred to in plaintiff's declaration, the operations over which are therein complained of, was owned by said Norfolk Terminal Company, and that said Norfolk Terminal Company in that year constructed tracks thereon which constituted a portion of its system of tracks for the reception, storing, retraining and transporting the cars en route in a direct line of transportation from its connection with the lines of the then Norfolk and Western Railroad Company, in Norfolk county, Virginia, to the piers then erected and owned by the Norfolk Terminal Company on the Norfolk harbor, and thereafter, in the year 1891, the said Norfolk Terminal Company having in 1889 become consolidated with the Norfolk and Western Railroad Company, the said Norfolk and Western Railroad Company from time to time constructed on said ground other tracks, which were used for like purposes, all of which said tracks so situate upon the ground referred to in the plaintiff's declaration were, continuously therefrom until a short time prior to

December, 1913, used by this defendant and its predecessors in title in its service of transportation for the specific purpose as hereinafter more specifically set out.

"(7) That in furtherance of its service of transporting coal and other freight from the States of Ohio and West Virginia, consigned for delivery to vessels at Norfolk, Virginia, it became necessary frequently to retrain the cars loaded with coal and other freight at various points on said road with a view to efficient transportation over its lines connecting such retraining point.

"That such freight was and is delivered to such vessels at and from a structure called a coal pier, and said pier is connected with the lines of transportation of this defendant by tracks for the transportation of cars or containers and motor vehicles to propel the same.

"That the tracks, heretofore, to-wit, in 1888, constructed by this defendant and its predecessors in title, as aforesaid, over the lands in the plaintiff's declaration referred to as the location of what is therein termed as a "hump," and the immediate approaches thereto, were used from that time, to the year 1913 as a route of transportation from one of said retraining points at Lambert's Point yards to points where said coal was transferred to the containers aforesaid, adapted to transporting said coal over said pier to said vessels.

"That a short time prior to December, 1913, it became necessary for this defendant, in the furtherance of its efforts to equip itself for the increasing demands of growing traffic, to alter the grade of its tracks over the said ground specified in the plaintiff's declaration by changing the grade from a level to an ascending grade with a rise of one and two tenths feet in each 100 feet, which is a lighter grade than that adopted and in use by this defendant in numerous places on other portions of its main lines, in order that the cars retrained at the Lambert's Point yard might be trans-

ported in trains of thirty cars or less to a series of tracks
on the defendant's system of railway from which all of said
cars composing such trains might be drifted by gravity,
one car at a time, to, a place and apparatus near said coal
pier where the contents of said cars could be transferred
in bulk to containers adapted to running along said piers
to the side of said vessels, and that the injury complained
of in the plaintiff's declaration is the noise, smoke and
cinders emitted from defendant's locomotives employed as
the motive power for transporting said trains of cars upon
the grade aforesaid; that said alteration was then begun
and was completed in December, 1913, and from that time
until the institution of this action, and to the present time,
this defendant has continuously used its tracks so changed
in respect to grade over said grounds for the purpose afore-
said, which the defendant avers are and were used in the
performance of its services and duties as a common carrier,
and further avers that all the uses and services to which the
said tracks have been, or are now being subjected, were
and are in the exercise of its privileges and in furtherance
of its public duties as a common carrier, as a service con-
stituting an essential part of its direct acts of transporta-
tion, as aforesaid.

"(8) And defendant avers that all its conduct and acts
and operations aforesaid have been done and conducted with
the exercise of due care and diligence and without negli-
gence on its part."

There was a demurrer by the plaintiff to said plea, which
was overruled by the court below by the order complained
of and the case is therefore presented to us upon said decla-
ration and plea with the demurrer to the latter.

From the allegations of the plea and those of the decla-
ration not denied by the plea the following material facts
appear:

## THE FACTS.

When in 1888 the ownership of the ground for right of way for the terminal yard above mentioned was acquired and when the yard was located by the Norfolk Terminal Company, the predecessor in title of the defendant, the charter of the latter did not require it to locate the yard at the place it was in fact located. It might have been located "at any point on the Norfolk harbor or Chesapeake Bay."

The "piers for the delivery of freight to connecting water carriers," mentioned in the charter, were not thereby required to be located at the place they were in fact located and they might have been located at any other place "on the Norfolk harbor or Chesapeake Bay."

The Terminal Company, after it was organized, and came into existence, never undertook to perform any duties of an independent common carrier. It never undertook to discharge any duties to the public with respect to the carriage of any freight originating on its line. No freight was received from or delivered by it to the public. It had no passenger or freight stations or depots. Its sole business was the construction and operation of a terminal yard as incidental, adjunctive or appurtenant to the business of the Norfolk and Western Railroad Company (afterwards the Norfolk and Western Railway Company, the defendant), and this incidental, adjunctive or appurtenant business was limited to the receiving of coal cars from the terminus of what was the main line of the defendant at Norfolk when this action was instituted, "storing, retraining and *transporting*" such coal cars, *i. e.*, storing, retraining and *distributing* them to their places of destination on the coal piers for transfer of their contents into the vessels of connecting water carriers, including, of course, the returning

of the empty coal cars to Norfolk to the principal carrier.

When the defendant acquired the ownership of the ground of the right of way of said yard, it constructed other tracks thereon and operated the yard in the same way it had been operated, *i. e.*, as incidental, adjunctive or appurtenant to its business as a common carrier, *i. e.*, as a switching yard for the distribution of such coal cars aforesaid at their destination.

The defendant, prior to its change of construction of a part of said terminal yard and method of operating such part of it, in 1913, complained of in the declaration, used a system of tracks thereon which ran practically on a level "for the reception, storing retraining and transporting" (distributing) coal cars brought to it by its main line of railway.

There was in 1913 a change of method of construction and operation of a part of said terminal yard, consisting of the construction by defendant of a "hump" or embankment on the side of the yard nearest to plaintiff's property, the placing of two tracks, which had been located there on a level, on the ascending grade of such embankment so that they passed along near and opposite plaintiff's property at a height of about twenty feet above their former level, and the subsequent "transporting" of all the said coal cars to their destination on said piers, over such two tracks. That such subsequent operation by locomotives propelling such coal cars up such grade (although said construction and operation were all done with due care and skill) produced the noises, vibration, smoke, soot, dust, cinders and gases which then first began and caused the loss of rent and injury to the market and rental values of plaintiff's property, alleged in the declaration as above noted.

The two tracks last above referred to, after such change in method of construction and operation of the yard afore-

said, were no longer used "for the reception, storing (and) retraining" of said coal cars, but solely for "transporting" them, but such "transporting" of them was merely from the receiving portion of the yard, below the grade aforesaid, to the summit of the embankment. On the summit of the embankment or "hump" there were constructed in 1913 a series of tracks which again received such coal cars, and by means of the latter tracks going thence down grade the coal cars were drifted by gravity, without the aid of any locomotives, and moved, one car at a time, to a place or apparatus near said coal piers where the contents of such coal cars were transferred in bulk to containers which ran along said piers to the sides of vessels and there deposited such coal into the vessels, its destination.

*Mann & Tyler,* for the plaintiff in error.

*Hughes, Little & Seawell* and *Waller R. Staples, Lucian H. Cocke* and *Theodore W. Reath,* for the defendant in error.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court:

There are two questions raised by the assignments of error—(a) one question being whether the provision of the Constitution of Virginia of 1902 on the subject of private property being "damaged" for public uses without just compensation, does or does not, as to new construction and operation since such Constitution went into effect, annul the legislative privilege theretofore possessed by public service corporations, when acting in their public capacity, to damage private property without liability for damages, to the extent of making "just compensation?"; and (b) the other question being whether in the instant case the de-

fendant was acting in its public or private capacity in doing the acts complained of, and hence whether it ever possessed the legislative privilege aforesaid pleaded by it in defense of the action?

In the view we take of the facts of this case and of the law applicable thereto, it will be necessary for us to consider only the latter question. Such question, it will be observed, is wholly independent of the constitutional question referred to and rests upon principles which existed prior to the Constitution of 1902, and which have continued to exist since, independently of the constitutional provision mentioned above. *Terrell* v. *C. & O. Ry. Co.,* 110 Va. 340, 348, 66 S. E. 55.

That a public service corporation may act in a private capacity, as distinguished from its public capacity, is now well settled. *Townsend* v. *Norfolk Ry. & L. Co.,* 105 Va. 22, 52 S. E. 970; *Terrell* v. *C. & O. Ry. Co., supra; Southern Ry. Co.* v. *McMenamin,* 113 Va. 121, 73 S. E. 980.

It is true that if a public service corporation in locating, constructing or changing the construction, and in the operation of its works, acts in its public capacity, general legislative authority given it so to do, when strictly pursued, unless that authority is limited or annulled by constitutional provision in the particular in question, will be construed to confer on the corporation immunity from all liability for damages, not imposed by statute law, for such location, construction, change of construction and operation. Such immunity is inseparably attendant upon the sovereign right of eminent domain which the legislature exercises untrammelled and unabridged, save only as it may be restrained by the Constitution, and it will be construed to be conferred on such a corporation by necessary implication by general legislative enactment on the subject where the corporation acts in its public capacity. In such case the harsh rule of *damnum absque injuria* applies in bar of all

70

suits against the corporation for damages not allowed by statute. *Fisher* v. *Seaboard Air Line Railway Co.*, 102 Va. 363, 46 S. E. 381. But, notwithstanding this rule—

It is settled law under the Virginia decisions cited above that, when a public service corporation acts in its private capacity, mere general legislative authority to establish, locate and operate its works will not confer upon it immunity from liability for damages resulting from a construction and operation of such works which would have been deemed a private nuisance at common law.

It is further settled by such decisions that if such works were not constructed for the very public duties for which the public service corporation was incorporated, but as incidental, adjunctive or appurtenant thereto merely, however necessary to the performance of the former duties, their operation will be considered and classed as an operation by the corporation in its private capacity. In such case the rule *sic utere tuo ut alienum non laedas* applies and controls the construction of the legislative enactment. The general legislative authority to locate, construct and operate the latter character of works will not be construed by implication to confer the immunity from liability for damages aforesaid, and the harsh rule of *damnum absque injuria* has no application.

This result, as pointed out by the opinion of this court delivered by Judge Keith, P., on rehearing in the *Townsend Case, supra,* may not be logical. As is there said: "Law is not an exact science. It has no invariable standard by which right may be measured. It does not submit to inflexible rules of logic, nor can it, in its application to the varied affairs of men, always clothe itself in the form of a syllogism." It will suffice here to say that such is the law, fixed by the decisions of this court above referred to and by the decisions of other courts of eminent authority therein cited.

Now then, was the change of construction and operation

complained of in the instant case done by the defendant in
its private capacity?

It is true that the operation complained of in the *Town-
send Case, supra,* was of a power house; in the *Terrell Case,
supra,* it was of a roundhouse; and in the *McMenamin Case*
it was not the transportation of cars through the switch
yard which was complained of, but the operation of a coal
chute and power house, firing of engines on the yard, and
other incidents to the operation of the yard, which were
subjects of complaint; but these cases involved and were
decided upon precisely the same principle which is involved
in the classification of a switch yard of a railroad company,
upon the inquiry of whether such construction and opera-
tion are done in the public or private capacity of such
company.

In discussing this subject, 1 Lewis on Em. Dom. (3d ed.),
at page 450, says: "On general principles, when railroad
appurtenances, such as a roundhouse, *switch yards,* repair
shops or *terminal plant,* cause a nuisance to neighboring
property by reason of noise, smoke, cinders, vibration, etc.,
there may be a recovery. But there are authorities to the
contrary."

Examination of the authorities cited by the learned
author last quoted *pro* and *con* satisfies us that the text is
supported by the greater weight of authority and is im-
pregnably sustained by reason and upon principle, where
the switch yard operation complained of does not serve a
passenger station or freight depot, so that such operation
is not required of the railroad company in the discharge
of its public duty in connection with such station or depot.

Further: The recent case of *Matthias* v. *Minneapolis,
etc., R. Co.,* 125 Minn. 224, 146 N. W. 153, 51 L. R. A. (N.
S.) 1017, decided since Mr. Lewis' estimable work referred
to was published. is directly in point on the question we
have under consideration as presented in the instant case.

That case involved a terminal yard, and, as in the instant case, the cars of freight were originally carried over tracks constructed and operated practically on a level. In that case, it is true, the ground acquired by the railroad company for its switch yard was in addition to the ground on which its original main line tracks were located and over which it for many years transported its cars of freight; but that circumstance, as we shall see, is immaterial. In 1912 the railroad company acquired additional land alongside of its original main line track, on the opposite side of such original right of way from the property of the plaintiff, and constructed a receiving yard on a part of such newly acquired land and a "hump" or embankment on another part of it, with an up-grade similar to that in the instant case, and thereafter diverted its cars of freight containing wheat, coming in over its main line, and "transported" such cars over the "hump," propelling them by locomotives to the summit of the "hump" to a series of tracks located on such summit, which there received such cars, and by means of the latter tracks, going thence downgrade the cars of wheat were drifted by gravity, without the aid of any locomotives, and moved to the grain elevators, where the contents of such cars of wheat were transferred into the elevators, its destination.

The "transportation" of the cars of wheat in the *Matthias Case* over the grade of the "hump" were precisely as much main line transportation and no more than was the "transportation" of the cars of coal in the instant case, over the "hump." It was essentially the same operation in both cases and that was a switching operation. In a certain sense, it is true, it was but a link in the transportation of the cars from their point of original shipment, perhaps in a distant State, over the main line of the railroad company until they reached its terminal yard, being detrained at such terminal yard to be retrained and carried over the "hump," as per-

haps they had been detrained, switched and retrained at various other switch yards at certain ends of. divisions of the company's main line before they reached the terminal yard in question, where switch yards for that purpose were provided by the company. But it is the construction of such very appurtenances and their operation which are not main line construction or operation, of the very public service for which the railroad company was incorporated, unless they serve stations or depots as aforesaid. They are, in such a case as the *Matthias Case* and the instant case, essentially merely appurtenant—mere incidental construction and operation—however necessary to the transportation service of the company, and their construction and operation necessarily fall within the same classification and rule applicable thereto as roundhouses, coal chutes, etc., and their operation.

Accordingly, in the *Matthias Case,* the railroad company was held liable in damages for a similar nuisance at common law, with similar results as alleged in the declaration in the instant case. In the *Matthias Case,* as in the instant case, the entrance or approach to the plaintiff's property was not interferred with by the railroad company. No part of the plaintiff's property was *taken* in either case. In the *Matthias Case* the new construction and operation complained of was about 600 feet from the plaintiff's dwelling house, on the opposite side of the railroad's original main line tracks right of way, whereas in the instant case the operation complained of was on the same side of defendant's right of way as the plaintiff's property.

The change of method of operating said terminal yard in the instant case consisted, in ultimate fact, in withdrawing the two tracks ascending the rising grade of the "hump" or embankment from their prior function of serving in part as tracks "for the reception, storing (and) retraining" of cars; and the subsequent use of such tracks for the "trans-

portation" of cars of coal; but such transportation was essentially a rehandling—a retraining—a switching yard transportation. Such "transportation" of such cars necessarily occurs in all handling of through freight in switch yards. It was, in ultimate fact, a switching operation—a switching of coal cars from one receiving yard below to another receiving yard above, upon the summit of the "hump" or embankment, where "a series of tracks on defendant's" terminal yard again received such cars, from whence they were drifted, one car at a time, on their way to containers which received their contents in bulk and, in turn, distributed the coal at different places along the piers by depositing it in vessels there awaiting it.

Moreover, in the instant case, the conclusion that the new construction and operation of a part of the terminal yard complained of in the declaration was but an operation merely incidental to the duties of the defendant which it performed in its public capacity is apparent when we consider the original relationship of the defendant, and its predecessor in title the Norfolk and Western Railroad Company, to the Norfolk Terminal Company and its operation of this terminal yard. Prior to the acquisition by the Norfolk and Western Railroad Company and defendant of such yard, their main line terminated at Norfolk. They had not undertaken, nor did their charters impose upon them any duties whatever to operate such yard. The Norfolk Terminal Company constructed and operated this yard under its charter, not as a common carrier, with the public duty imposed by law on all common carriers of freight on whom the right of eminent domain is conferred by statute, of receiving and transporting all freight tendered to it by the public for transportation. It never assumed or undertook to discharge that public duty, although perhaps its charter was broad enough to have authorized it to do so. It never equipped itself with any depot or other facilities

for that purpose.   The only duty it ever performed or undertook to perform was the mere duty of operating a terminal yard, or switch yard for the defendant's predecessor, the Norfolk and Western Railroad Company, so as to distribute a portion of a particular kind of freight brought to Norfolk by the last named company, to-wit, the cars of coal destined to vessels of connecting water carriers.   In performing such a duty it was not performing a duty to the public such as the Norfolk and Western Railroad Company was then performing as a common carrier in bringing such freight to Norfolk.   It was performing only a contract duty to the latter company, and a duty of precisely the same character as might have been performed by a transfer company, incorporated or unincorporated, carrying passengers or freight from the terminus of the Norfolk and Western Railroad Company's line to wharfs or vessels or to the stations or depots of other carriers located in or near Norfolk (*Kentuck, &c., Bridge Co.* v. *L. & N. R. Co.,* 37 Fed. 567, 2 L. R. A. 289), or as might have been performed by any other incorporated company supplying the Norfolk and Western Railroad Company, under contract, with light, heat or power, or any other like service incident and even necessary for the performance of its duty as a common carrier. And it was a duty neither the Norfolk and Western Railroad Company nor defendant could have been compelled to allow the Norfolk Terminal Company to perform.   (See the case last above cited.)

Therefore, when the Norfolk Terminal Company constructed and while it operated said terminal yard, it is plain it was performing no duty which the Norfolk and Western Railroad Company was required by its charter or by other statute to perform.   Moreover, it was performing no public duty, imperatively imposed by law on it upon its undertaking such business, but merely (as above stated) a contract duty to the Norfolk and Western Railroad Company, which

it was *permissively* authorized to perform by its charter. Clearly, then, the original ·construction and subsequent operation of said terminal yard by the Norfolk Terminal Company fell within the classification of the power house operation in the *Townsend Case, supra.*

This becomes more apparent when the permissive char-
. acter of the charter of the Norfolk Terminal Company, with respect to the location of the terminal yard, is compared with that of the legislative act relied on by the defendant in the *Townsend Case.* The statute in that case provided: "The said company shall have power to construct, lease, purchase or acquire by consolidation with any other company or companies and operate and maintain in the city or county of Norfolk, or both, and in any other city, town or village in the said county, suitable works, machinery and plants for the manufacture of electricity * * *." In the opinion of this court, delivered by Judge Keith, P., on re-hearing, in reference to such legislative authority, it is said: "It will be seen that the language is not imperative, but permissive, and that it does not confer statutory sanction for the commission of a nuisance in any way whatever, and most assuredly cannot be said to confer it in express terms, 'or by clear and unquestionable implication from the powers given,' so that it cannot be fairly said that 'the legislature contemplated the doing of the very act which occasioned the injury, and immunity is not to be presumed from a general grant of authority.' " As noted in the statement of facts about the charter of the Norfolk Terminal Company, it did not designate the location of the terminal yard. By the express terms of such charter, it might have been located "at any point on the Norfolk harbor or Chesapeake Bay." Hence, upon the reasoning in and upon the principle on which the *Townsend Case* rests, the construction and operation of said terminal yard by the Norfolk Terminal Company must be classed as action by that company in its private capacity, merely incidental to the public service of

the Norfolk and Western Railroad Company, whom it served, and not protected by the shield of legislative privilege aforesaid.

This being so, it is apparent that upon the subsequent acquisition of the terminal yard, its operation by the Norfolk and Western Railroad Company, and later by the defendant, the Norfolk and Western Railway Company, was the same character of service to themselves, namely, in their private capacity. The defendant, therefore, would have been liable in damages for the nuisance at common law alleged in the declaration in the instant case under the *Townsend Case* and other authorities above cited, had the nuisance been caused by the original operation of the terminal yard by it, and is so liable for the new construction and operation of the terminal yard complained of in the plaintiff's declaration. Such new construction and operation is material in the instant case only as bearing on the beginning of the injury alleged and the consequent commencement of the running of the statute of limitations.

The case of *Fisher.*v. *Seaboard Air Line Ry. Co., supra,* however, is strongly urged by the defendant upon our attention as being opposed to the conclusion we have reached, above stated. As pointed out in the *Townsend* and *Terrell Cases, supra,* the *Fisher Case* involved a main line change of construction and operation of the railroad company, and hence action of the latter in its public capacity. As we have noted above, for such action, if in strict pursuance of the legislative authority and performed with due care and skill, the legislative privilege, subject only to such liability as the statute law provides, is an absolute bar to the assertion against the railroad company of any liability for damages, if such legislative privilege exists. It does exist as to main line construction and operations of a railroad company, if the legislative authority invoked has been strictly pursued, and such authority has not been limited or an-

71

nulled in any particular by the Constitution of the State. As to any construction or operation by a railroad company, however, which is not in its public, but in its private capacity, general legislative privilege is no bar to the assertion against it of liability for damages for any action which creates a nuisance at common law, although the legislative authority be unlimited and be not annulled in any particular by the Constitution of the State. Hence the *Fisher Case* in no way conflicts with out conclusion aforesaid.

The same reason which distinguishes the *Fisher Case* from the instant case also distinguishes therefrom the following cases relied on for defendant, namely: *Bennett* v. *Long Island Ry. Co.*, 181 N. Y. 431, 74 N. E. 418; *Chicago* v. *Union Stock Yards*, 164 Ill. 224, 35 L. R. A. 281; *C. R. I. & P. R. Co.* v. *Joliet*, 79 Ill. 25; *I. C. R. Co.* v. *Grabill*, 50 Ill. 224; *Carroll* v. *Wisconsin Cent. R. Co.*, 40 Minn. 168, 41 N. W. 661.

Defendant also relies on the case of *Church* v. *Oregon Short Line, supra.* That was a switch yard case. It was an action to recover damages for injuries to plaintiff's church property, alleged to have been caused by the annoyance of *noise only* of trains and engines on tracks lawfully constructed and operated for purposes of switching and making up of trains near the church. The court in that case, it is true, held that switch yards do not fall within the same class as roundhouses, coal chutes, etc., and that railroads as to the operation of their switch yards enjoy the same immunity from liability for damages as they do with respect to main line operations, because of legislative privileges. But as we have seen such a holding, in that broadness of application, is unsound in principle and opposed to other authority. And in that case it is conceded that if instead of the mere annoyance from noise only, there had been a physical disturbance or interference with the property right by the casting of soot, cinders, etc., upon the

property, a vibration of it, or the emission of smoke, physically injuring the property and causing a nuisance of that character, the plaintiff would have been entitled to recover damages.  On this point the court in its opinion, at p. 864, said: "To obtain relief for the latter consequences in a case of nuisance no constitutional nor statutory enactment was necessary."  We merely note the latter view in passing, but we do not wish to be understood as agreeing with the conclusion of law there stated.  In our opinion, both upon principle and upon the overwhelming weight of authority, which it would be out of place here to cite, if a switch yard construction and operation falls within the same class as main line construction and operation, and consequently within the immunity from liability for damages aforesaid by legislative privilege, then, unless the legislative authority is limited or annulled in some particular by the State Constitution, no action for damages in such case would lie.

The case of *L. & N. Terminal Co.* v. *Lellyett,* 114 Tenn. 368, 85 S. W. 881, 1 L. R. A. (N. S.) 49, is also relied on for defendant.  But in that case the operation of a switch yard, as well as of a roundhouse, coal chute, an up-grade track construction to coal bins, and operation of engines and cars thereon, were complained of, and the injury resulting from the operation of the switch yard was perhaps the gravamen of the case according to the proof.  And the court in its opinion draws no distinction between the switch yard operation and the other operations complained of, but classes the former, as well as the latter, as being done by the railroad company in its private capacity—which is in accord with the true principle involved and with our holding above.

Numerous other decisions are cited for plaintiff and defendant, but they bear chiefly upon the constitutional question first above mentioned, which it is unnecessary for us

to consider in the instant case and hence any detailed reference to such cases would needlessly prolong this opinion.

For the foregoing reasons we are of opinion that there was error in the order complained of, and the same will be set aside and annulled, the demurrer of the plaintiff to the plea of the defendant aforesaid will be sustained, and the case will be remanded to the trial court for further proceedings to be had therein not in conflict with this opinion.

*Reversed.*