IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
September 12, 2005 Session

GEORGE R. CALDWELL, JR., ET UX. v. PBM PROPERTIES

Appeal from the Circuit Court for Knox County
No. 2-711-99     Harold Wimberly, Judge

No. E2004-02512-COA-R3-CV - FILED OCTOBER 24, 2005

George R. Caldwell, Jr. and Angie R. Caldwell ("Plaintiffs" or "Mr. Caldwell" as appropriate) sued PBM Properties ("Defendant") for nuisance claiming that during Defendant's development of Blue Grass Heights Subdivision ("Blue Grass"), Defendant denuded the land altering water runoff and causing Plaintiffs' property to flood. The case was tried before a jury and the jury found that Defendant was 100% liable to Plaintiffs for a temporary flooding nuisance. The jury awarded Plaintiffs $3,820.50 in damages. Plaintiffs appeal claiming that the evidence supported a finding of permanent nuisance, the nuisance had to be abated on Defendant's property to be considered abated, and, the jury did not award the proper amount of damages. We affirm.

Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed;
Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which HERSCHEL P. FRANKS, P.J., and CHARLES D. SUSANO, JR., J., joined.

Glenna W. Overton, Knoxville, Tennessee, for the Appellants, George R. Caldwell, Jr. et ux Angie R. Caldwell.

Robert R. Davies, Knoxville, Tennessee, for the Appellee, PBM Properties.

# OPINION

## Background

Mr. Caldwell is a general contractor who built the homes in the Impala Estates Subdivision where Plaintiffs' home is located. He, his wife, and their two children moved into one of the last houses built in this subdivision. Impala Estates was completed at the end of 1994 or the beginning of 1995.

Plaintiffs sued Defendant in November of 1999, claiming that during the construction and development of Blue Grass, a neighboring property development, Defendant denuded the land altering water runoff and causing Plaintiffs' property to flood numerous times. The case was tried before a jury in October of 2002.

At trial, Mr. Caldwell testified that before he built Impala Estates, he never saw any water problems with his property. He explained that when he developed Impala Estates, the surrounding land consisted of scattered houses, woods, and grassy areas.

Mr. Caldwell testified that in early 1997, the property at the corner of Hart Road and Blue Grass Road was purchased by John Murphy and the land was developed into the Heartland Subdivision ("Heartland"). Mr. Caldwell testified that during the development of Heartland, "[t]hey denuded and stripped off all the trees, grass, growth on that 10 to 11 acres of ground, built a road in here and started building houses." He stated: "The problem that I had with Heartland Subdivision building this subdivision was that they came in and they stripped 10 acres of ground and didn't do anything to stop the water flow off of it."

Mr. Caldwell testified that his family suffered their first flood on June 14, 1997. He stated that his home had approximately 32 to 34 inches of water in the basement from this flood and that the water damaged automobiles and personal items inside the garage including weapons, tools, a lawnmower, refrigerators in the garage, food in the refrigerators, a heat and air unit, and a water heater. Mr. Caldwell further testified that this flood knocked down a wall and door, and entered the living space destroying furniture, pictures, and clothing.

Plaintiffs sued the Heartland developers and in June of 1999, Plaintiffs and Heartland reached an agreement and settled the case for $82,500 paid to Plaintiffs. As part of that settlement, Heartland increased the size of their detention basin and Plaintiffs released Heartland from both temporary and permanent nuisances and granted Heartland a permanent easement to flood Plaintiffs' property. Mr. Caldwell testified that before Heartland increased their detention basin,

> [i]t didn't take much rain. It didn't seem to take much rain at that time to have a
> flood event at our home, whether it was, you know, 3, 4, 5 inches in the driveway to
> where my drains were handling the water that came to having 34 to 36 inches of

water into our home, crashing down our garage doors, damaging the garage, again, of course, the interior of the house.

Mr. Caldwell testified that since Heartland enlarged its basin, Plaintiffs have not been flooded by Heartland.

At about the same time Plaintiffs settled with Heartland, Blue Grass was being constructed east of Heartland. Mr. Caldwell testified that after Heartland enlarged their basin, his family got flooding "from an 18-inch pipe that was protruding through the berm, the back side of the berm of the detention basin at Heartland." Mr. Caldwell testified that the water from the 18-inch pipe was coming from Blue Grass.

Mr. Caldwell testified that "the fourth significant flooding of our home" occurred on June 24, 1999. He stated that "[t]his [flood] water appeared to be coming from that same pipe … coming from Blue Grass Heights Subdivision." Mr. Caldwell testified that they also suffered floods on July 6; July 7; July 10; July 12; and July 14, of 1999; and on July 3, 2002. He stated: "Those were the horrific floods that we received from all the additional storm waters coming from Blue Grass Heights."

When asked how the floods affected the use and enjoyment of their home, Mr. Caldwell stated:

> You know, we couldn't go anywhere. We couldn't do anything hardly. Every time it rained we had to be at home, or at least I had to be at home to make sure that the necessary items were picked up, put up into what I call the dry zone. Of course, I would have to leave work at the time to do it. As I stated also that, you know, a lot of times the floods came at night.…And, you know, just having to go live like that, not to have the use of your home and worrying about it raining and flooding your house, was just - - you know, it was a horrific event that we had to live with.

Mr. Caldwell testified that he contacted Knox County ("the County") and complained and also wrote letters to Congressman Duncan. He testified that, apparently in response to his complaints, the County installed a storm drainage easement ditch some time before June 14, 2000. Mr. Caldwell stated:

> Now all the water that comes from Blue Grass Subdivision runs down the ditch line and runs into this pipe and is carried off through the new 30-inch pipe that the county put in.…[U]p until our latest flood event of July of 2002, it's carried off all the water. The flooding events at our home have been very minute, if any.…And so the ditch is something that we thought we were finally relieved of any and all flooding, Blue Grass, Heartland, or anybody else. Apparently that did not - - or apparently it was not the truth.

Mr. Caldwell testified that by the later part of 1999,

> we were pretty confident that our flood problems were dissipated, and we started the construction project in the basement of the home. And in the process of this I had an architect draw some pictures of plans up of the construction of the basement, how we were going to redesign it, that in fact in the event of a flood event that the money that we were about to spend was not going to get ruined. So we had to take some precautions in that aspect that I spent - - or I should say we spent several thousands of dollars to protect the heated square footage of our home.
>
> I knew there was no way to fix the garage to where I could stop the water, but I did fix the inside that I could mitigate the water…had the concrete floor in the garage scored…new block walls installed…[and] anchored to the existing concrete floor with reinforcing barb…poured those block walls full of concrete…installed a waterproof or watertight door into the wall of this wall separating the garage and my home, poured it full of concrete in the frame…waterproofed both sides of that block wall with Dam Tite, which is a waterproofing substance that they use on TVA dams…used a product called Ugly…a paint product that you paint on both sides of the wall to mitigate water from penetrating it.

Mr. Caldwell testified that the renovations cost approximately $60,000 or $65,000. He then stated: "Unfortunately, we flooded again. We had an horrific flood situation that came on or about July 3rd of [2002]." He testified that during this flood,"[t]he garage doors were broken, knocked off their tracks. A motorcycle that was in the garage was under water …" and the family's pet ferret who was in a cage in the garage drowned.

Mr. Caldwell testified that in his opinion, his home is worth approximately $190,000 to $200,000, but that the fair market value of the home with the flooding problem is only $105,000 or $110,000. He also testified that his home was worth $100,000 after the 1998 floods, the last flood for which Plaintiffs sued Heartland, and that his house now is worth approximately $110,000. Mr. Caldwell explained that his house is worth more now than it was after the 1998 floods, even with the flooding, because he did not finish off the basement until late 2000, or early 2001.

An exhibit introduced at trial shows that Plaintiffs claimed damages of $2,782.50 for repairs, $650 for personalty, and $388 for incidental damages for the 1999 floods. The exhibit also documents damages in each of these categories for the 1998 floods. Further, the exhibit shows that Plaintiffs claimed structural damages in the amount of $27,692. Mr. Caldwell testified that they sued Heartland for the floods that occurred in 1997 and 1998, and admitted that the amount of damages Plaintiffs asked for in the lawsuit against Defendant is the same amount they claimed in the lawsuit against Heartland. Mr. Caldwell testified that they didn't actually receive $82,500 when they settled with Heartland because they had costs to litigate.

When asked about the July 2002 flood, Mr. Caldwell admitted that it could have been Blue Grass, or Heartland, or the rest of the watershed that caused this flood. He admitted that he did not know if the Heartland detention basin had overflowed and caused this flood. Mr. Caldwell also admitted that not all of the water from Blue Grass drains toward his property. He claimed that the drains in his driveway can handle "every normal rainfall that there is as long as I don't get any additional waters coming from somewhere else."

James Bauman, a registered civil engineer who specializes in the field of surface water hydrology, testified as Plaintiffs' expert witness. Mr. Bauman explained that "[s]urface water hydrology is the study of the flow of surface water from a given watershed for the purpose of designing permanent drainage structures," and that a watershed is an area "from which water is flowing away. Water flows from high to low." Mr. Bauman testified that "[t]he numbers that are associated with engineering design storms are an indication of the average return frequency of that storm. Typically they are larger and larger in numerical value. A one-year storm is the storm that on average statistically is expected to occur every year." Mr. Bauman explained that this does not mean that a ten-year storm happens only once every ten years. He explained that it is possible to have two ten-year storms in one week.

Mr. Bauman performed a study in January of 2002, of the flooding problems experienced by Plaintiffs in 1999. Mr. Bauman testified that he had previously done work in the Heartland Subdivision and explained that there were changes in the area since that time stating:

> What was different, though, was the new development in the Blue Grass Heights area in June and July of 1999. Blue Grass Heights was developed, that is, the street was installed, the curb inlets, the underground storm water system. The detention basin for Blue Grass Heights was constructed in June and July of 1999. But the residences themselves were under construction in the subdivision at that time. And the subdivision had been cleared. There was a lot of exposed earth, a lot of building materials. Many of the homes in this area of the Blue Grass Heights were under construction at the time.…[D]uring development an open piece of ground like that is very vulnerable. A large storm event will quickly produce a very high volume of water. It has a tendency to carry a lot of the silt and sediment. So it's a very, very touchy time during development of the site.

Mr. Bauman explained his findings, stating:

> When I looked at it for the conditions that existed in June and July of 1999 when [Blue Grass] was under construction, I found that there was significant runoff even for small-intensity storms and that these runoffs would be very quickly collected by the existing detention basin. But because the detention basin here is designed for the subdivision after it's done, it was easy to kind of overpower it there with the floodwaters coming off the site during construction, because, again, when the construction is supposed to be completed, that subdivision is supposed to have lawns

-5-

and trees and shrubs and all kinds of different vegetation that would, you know, help slow down the flow of water leaving the site. But during construction it was very easy even for a small storm to quickly fill the basin with a lot of muddy water.

Mr. Bauman opined that Blue Grass was the source of the flood waters in June and July of 1999. He further opined that these floods occurred because "[t]he subdivision was under construction at the time. The ground was stripped. It just simply was not able to hold back the waters from the rainfall events. The waters quickly drained to the detention basin in the subdivision, and then they flow in the pipe underground to the discharge point." Mr. Bauman explained:

[W]hen the capacity to carry the water in the ditch on each side of Hart Road is overpowered, water just flows across and ultimately ends up downgradient in the front yard of the [Plaintiffs'] property and, unfortunately, finds its way into their driveway and into their basement.

But that's the path of the floodwaters from the detention basin in Blue Grass Heights.

Mr. Bauman opined that in 1999, Heartland was not flooding the Plaintiffs' property because Heartland had significantly enlarged their basin and "also changed the location of their outfall structures." Mr. Bauman explained:

The primary spillway for the Heartland Road Subdivision is piped underground to the pipe on the east side of Hart Road, and it also continues underground below Hart Road and then continues underground to a point downgradient of the [Plaintiffs'] home. So the effect of this is there's a very clear separation in the floodwaters. The water that you see in the ditch along the east side of Hart Road, there's only one place for that to come from, and that is from the Blue Grass Heights, because the water from the Heartland basin never flows above ground.

Mr. Bauman opined that Plaintiffs flooded in 2002, because "[t]his storm event in July of 2002 is a very large rainfall event." He opined that this storm would "probably have been something in the order of 500-, maybe 1,000-year return period storm. Very large event." Mr. Bauman explained it is not feasible to design a detention basin to handle such a storm and is not economically possible to foresee such a storm event. He stated: "If the engineering community were required to try to abate runoff from development for storm events of this size, you'd never be able to build anything. It's just not economically feasible." Mr. Bauman opined that Blue Grass was not the sole contributor to the flood waters in the 2002 storm. Instead, he testified that the waters came from a variety of sources. Mr. Bauman further stated he would be surprised if the Heartland basin had not overflowed during the 2002 storm, as the Heartland basin will hold up to a ten-year storm and the 2002 storm was much larger than a ten-year storm.

Mr. Bauman opined that it is not possible for Blue Grass Heights to abate the flooding onto Plaintiffs' property. However, he opined that the roadside ditch along the east side of Hart Road that was enlarged by the County has helped to abate some of the flooding. Mr. Bauman also testified that "[t]he basin that exists in Blue Grass Heights is properly designed for the postdevelopment land use condition which they evaluated. But that was not the condition that was present in June and July of 1999 when the subdivision was stripped and under construction." Mr. Bauman testified that Blue Grass is close to being complete and stated:"I would expect that once the yards come in and shrubs are planted and trees are planted and Blue Grass Heights Subdivision begins to, you know, really grow and catch on and establish itself, I would expect the existing system to work well, yes." Mr. Bauman opined that with the subdivision almost complete and the ditch the County put in, the flooding threat is "substantially reduced."

Mr. Bauman admitted that he did not look at the total watershed for Plaintiffs' property, just at Blue Grass and Heartland, and admitted that there is a whole lot more land and other neighborhoods in this watershed. Mr. Bauman opined that the 1997 and 1998 floods were caused by Heartland. Mr. Bauman testified that he blames Blue Grass for the 1999 floods only.

Stuart N. Henry, a registered civil engineer specializing in "hydrology, site design, [and] flooding issues" testified as Defendant's expert witness. Mr. Henry testified he performed studies on the flooding Plaintiffs experienced in 1997, 1998, and 1999. Mr. Henry explained that the watershed that drains to Plaintiffs' property is approximately 47 acres and that Blue Grass comprises only four to four and a half acres of that, or less than 10%.

Mr. Henry opined that for two-year and five-year storms, the Blue Grass post-development runoff of water with the detention basin that exists is equal to the pre-development runoff, and that for a ten-year, 25-year, and 100-year storm, the post-development runoff is even less than the pre-development runoff. Mr. Henry opined that Blue Grass did not contribute to the 1998 and 1999 floods, "any more than the predevelopment or undeveloped site would have."

After presentation of the evidence, the jury reached its verdict and a judgment was entered on December 12, 2002, in accordance with the verdict. The jury found Defendant "100% liable to the Plaintiffs for a temporary flooding nuisance only, in 1999 only …" and awarded Plaintiffs $3,820.50 in damages. Plaintiffs filed a motion for amendment of judgment and additur, or for a new trial, which the Trial Court denied by order entered September 22, 2004. Plaintiffs appeal to this Court.

## Discussion

Although not stated exactly as such, Plaintiffs raise three issues on appeal: 1) whether there is material evidence to support the jury's verdict of a temporary nuisance, rather than a permanent nuisance; 2) whether for a nuisance to be considered abated, Defendant must take the necessary steps on Defendant's own property; and, 3) whether there is material evidence to support the amount of the jury's award for damages.

"Findings of fact by a jury in civil actions shall be set aside only if there is no material evidence to support the verdict." Tenn. R. App. P. 13(d). As our Supreme Court has explained:

> It is the time honored rule in this State that in reviewing a judgment based upon a jury verdict the appellate courts are not at liberty to weigh the evidence or to decide where the preponderance lies, but are limited to determining whether there is material evidence to support the verdict; and in determining whether there is material evidence to support the verdict, the appellate court is required to take the strongest legitimate view of all the evidence in favor of the verdict, to assume the truth of all that tends to support it, allowing all reasonable inferences to sustain the verdict, and to discard all to the contrary. Having thus examined the record, if there be any material evidence to support the verdict, it must be affirmed; if it were otherwise, the parties would be deprived of their constitutional right to trial by jury.

*Crabtree Masonry Co., Inc. v. C & R Constr., Inc.*, 575 S.W.2d 4, 5 (Tenn. 1978).

We first consider whether there is material evidence to support the jury's verdict of a temporary nuisance. This Court discussed nuisance in *Clabo v. Great American Resorts, Inc.*, stating:

> "A nuisance has been defined as anything which annoys or disturbs the free use of one's property, or which renders its ordinary use or physical occupation uncomfortable." *Pate v. City of Martin*, 614 S.W.2d 46, 47 (Tenn. 1981). A nuisance is either temporary or permanent and the law in Tennessee is well settled as to the proper measure of damages for each category.
>
> A temporary nuisance is defined as:
>
> > [one] which can be corrected by the expenditure of labor or money . . . . Where the nuisance is temporary, damages to property affected by the nuisance are recurrent and may be recovered from time to time until the nuisance is abated. "The measure of such damages [is] the injury to the value of the use and enjoyment of the property, which may be measured to a large extent by the rental value of the property, and extent that rental value is diminished."
>
> *Id.* at 48 (citations omitted). *Accord, e.g., Nashville v. Comar*, 88 Tenn. 415, 12 S.W. 1027, 1030 (1890); *Harman v. Louisville, New Orleans & Texas R.R. Co.*, 87 Tenn. 614, 11 S.W. 703, 704 (1889); *Pryor v. Willoughby*, 36 S.W.3d 829, 831 (Tenn. Ct. App. 2000); *Hayes v. City of Maryville*, 747 S.W.2d 346, 350 (Tenn. Ct. App. 1987); *City of Murfreesboro v. Haynes*, 18 Tenn. App. 653, 82 S.W.2d 236, 238 (1935).

A permanent nuisance is one that is "presumed to continue indefinitely, and is at once productive of all the damage which can ever result from it . . . ." *Caldwell v. Knox Concrete Prods., Inc.*, 57 Tenn. App. 393, 391 S.W.2d 5, 11 (1964). The proper measure of damages for a permanent nuisance is "the injury to the fee or permanent value of the property . . . ." *Louisville & Nashville Terminal Co. v. Lellyett*, 114 Tenn. 368, 85 S.W. 881, 890 (1905). *Accord, e.g., Harman*, 11 S.W. at 704; *City of Murfreesboro*, 82 S.W.2d at 238.

As this Court has noted, neither definition of nuisance is entirely satisfactory because "nearly every nuisance could be abated by the devotion of enough time and money to it; and a permanent improvement to property may, in conjunction with the forces of nature, cause harm only periodically." *Kearney v. Barrett*, No. 01-A-01-9407-CH-00356, 1995 WL 1690, at *2, 1995 Tenn. App. LEXIS 4, at *5 (Tenn. Ct. App. Jan. 4, 1995), *appl. perm. appeal denied April 24, 1995*. It is helpful to look, as did older Tennessee cases, at "whether the harm resulted from reasonable and lawful operations on the defendant's property . . . (as opposed to negligent) and still interfered with the use and enjoyment of the plaintiff's property . . . ." *Id.* If the damages resulting from the nuisance are due to the fact that the defendant is "negligently operating its property so as to unnecessarily create the damage" and it is within the defendant's power to operate in a non-negligent manner, then the nuisance is temporary. *Robertson v. Cincinnati, New Orleans & Texas Pacific Ry. Co.*, 207 Tenn. 272, 339 S.W.2d 6, 8 (1960). If, on the other hand, "the operation is done with due care considering the use thereof, and it is not contemplated that any change in operation will be made, the *damage is permanent* and the proper measure of damage is the injury to the fee." *Butcher v. Jefferson City Cabinet Co.*, 59 Tenn. App. 59, 437 S.W.2d 256, 259 (1968) (emphasis in original).

*Clabo v. Great American Resorts, Inc.*, 121 S.W.3d 668, 671-72 (Tenn. Ct. App. 2003).

Although Plaintiffs' expert, Mr. Bauman, opined that it is not possible for Blue Grass to abate the flooding onto Plaintiffs' property, he also opined that the roadside ditch that was enlarged by the County has helped to abate some of the flooding, and testified that "[t]he basin that exists in Blue Grass Heights is properly designed for the postdevelopment land use condition which they evaluated." Mr. Bauman further testified that Blue Grass is close to being complete and stated: "I would expect that once the yards come in and shrubs are planted and trees are planted and Blue Grass Heights Subdivision begins to, you know, really grow and catch on and establish itself, I would expect the existing system to work well, yes." Mr. Bauman opined that with the subdivision almost complete and the ditch the County put in, the flooding threat is "substantially reduced." In addition, Mr. Caldwell testified:

Now all the water that comes from Blue Grass Subdivision runs down the ditch line and runs into this pipe and is carried off through the new 30-inch pipe that the county

put in.…[U]p until our latest flood event of July of 2002, it's carried off all the water. The flooding events at our home have been very minute, if any.

As for the July 2002 flood, Mr. Caldwell admitted that it could have been Blue Grass, or Heartland, or the rest of the watershed that caused this flood, and admitted that he did not know if the Heartland detention basin had overflowed and caused this flood. Mr. Caldwell also admitted that not all of the water from Blue Grass drains toward his property. Mr. Caldwell testified that Heartland, not Blue Grass, was responsible for the 1997 and 1998 floods. This was confirmed by Mr. Bauman, Plaintiffs' expert, who testified he holds Blue Grass responsible for the 1999 floods only.

Mr. Bauman also testified about the 2002 storm and opined that Plaintiffs flooded at that time, because "[t]his storm event in July of 2002 is a very large rainfall event." Mr. Bauman opined that this storm would "probably have been something in the order of 500-, maybe 1,000-year return period storm. Very large event." Mr. Bauman explained it is not feasible to design a detention basin to handle such a storm and is not economically possible to foresee such a storm event. He stated: "If the engineering community were required to try to abate runoff from development for storm events of this size, you'd never be able to build anything. It's just not economically feasible." Mr. Bauman further opined that Blue Grass was not the sole contributor to the flood waters in the 2002 storm. Instead, he testified that the waters came from a variety of sources. Mr. Bauman testified he would be surprised if the Heartland basin had not overflowed during the 2002 storm, as the Heartland basin will hold up to a ten-year storm and the 2002 storm was much larger than a ten-year storm. Mr. Caldwell admitted that as part of Plaintiffs' settlement of their lawsuit with Heartland, Plaintiffs gave Heartland a permanent easement to flood their property.

Plaintiffs argue that the judgment should be reversed because "the evidence presented to the jury supported the Plaintiffs' allegation that the Defendant created and maintained a permanent nuisance." While the evidence may well have supported a jury finding that this was a permanent rather than a temporary nuisance, that does not resolve the question before us in this appeal of the jury's verdict. The issue before us is not whether the evidence supports a finding of a permanent nuisance but instead whether there is material evidence to support the jury's finding and verdict that there was a temporary nuisance rather than a permanent nuisance.

The jury was presented with material evidence showing that Blue Grass was responsible only for the 1999 floods, which occurred during the Blue Grass construction, and that Plaintiffs had suffered only one flood since that time. Both Mr. Caldwell and Mr. Bauman admitted Blue Grass could not solely be held responsible for the 2002 flood. Mr. Caldwell admitted that water could have overtopped the Heartland detention basin during the 2002 storm, and that Heartland holds a permanent easement that allows Heartland to flood Plaintiffs' property. The evidence shows that since the County enlarged the roadside ditch some of the flooding has been abated and Mr. Bauman testified that once Blue Grass is complete and the vegetation grows in, the existing system should work well. The jury was presented with Mr. Henry's testimony that in his opinion the Blue Grass

post-development water runoff for two-year and five-year storms is equal to the pre-development runoff, and that for a ten-year, 25-year, and 100-year storm the post-development runoff would be even less than the pre-development runoff. There was material evidence presented to the jury for it to find that the nuisance was temporary and, that the nuisance not only could be abated, but, had been abated, except for the very unusual 500 or 1000-year storm and flood for which Plaintiffs' expert, Mr. Bauman, did not hold Defendant responsible. We affirm the jury's verdict of a temporary nuisance.

We next consider whether for the nuisance to be considered abated, Defendant must have taken steps on Defendant's own property. Plaintiffs argue that "[f]or a nuisance to be abated, it must be abated on the Defendant's property." However, Plaintiffs admit that no Tennessee case exists "directly holding this opinion …." Instead, Plaintiffs cite to several cases wherein this Court and our Supreme Court have found that specific defendants could have taken specific steps to abate a particular nuisance.

We first note that in the case at hand, Defendant has taken steps to abate the nuisance on Defendant's property. Mr. Bauman opined that the 1999 floods occurred because "[Blue Grass] was under construction at the time. The ground was stripped." Mr. Bauman testified that Blue Grass is close to being complete and stated: "I would expect that once the yards come in and shrubs are planted and trees are planted and Blue Grass Heights Subdivision begins to, you know, really grow and catch on and establish itself, I would expect the existing system to work well, yes." Mr. Bauman opined that with the subdivision almost complete and the ditch the County put in, the flooding threat is "substantially reduced."

In addition, both Plaintiffs' expert and Defendant's expert agree that Blue Grass constitutes only a small portion of the watershed that drains onto Plaintiffs' property. As such, Blue Grass can take steps to abate only the flood waters coming from Blue Grass. Blue Grass has no duty to take steps to abate flood waters coming from other areas of the watershed.

The evidence shows that Defendant has taken steps on Defendant's property to abate the nuisance, in part, by completing construction and planting grass, shrubs, and trees, and, in part, by constructing an underground storm water system and a detention basin that Plaintiffs' expert testified "is properly designed for the postdevelopment land use condition which they evaluated." The evidence also shows that Blue Grass has neither the duty nor the ability to control all of the non-Blue Grass watershed that drains onto Plaintiffs' property. In addition, the evidence shows that the roadside ditch that the County enlarged has contributed to abating the flooding. We decline to hold that the only way for a defendant to abate a nuisance is by that defendant taking steps to do so on the defendant's property. We hold that even if Plaintiffs' position was the law, Defendant did take steps on its property to abate the nuisance.

Finally, we consider whether there is material evidence to support the amount of the jury's award for damages. As we have already affirmed the jury's verdict of a temporary nuisance, we look to see the proper measure of damages for temporary nuisance. For a temporary nuisance,

"[t]he measure of such damages [is] the injury to the value of the use and enjoyment of the property, which may be measured to a large extent by the rental value of the property, and extent that rental value is diminished." *Clabo*, 121 S.W.3d at 671 (citation omitted).

An exhibit introduced at trial shows that Plaintiffs claimed damages of $2,782.50 for repairs, $650 for personalty, and $388 for incidental damages for the 1999 floods. The exhibit also documents damages in each of these categories for the 1998 floods. Further, the exhibit shows that Plaintiffs claimed structural damages in the amount of $27,692. Mr. Caldwell testified that they earlier sued Heartland for the floods that occurred in 1997 and 1998, and admitted that the amount of damages Plaintiffs sued for in the current lawsuit is the same amount they claimed in their earlier lawsuit against Heartland, which Plaintiffs settled. Mr. Caldwell testified that they didn't actually receive $82,500 when they settled with Heartland because they had costs to litigate. The jury awarded Plaintiffs damages in the amount of $3,820.50, which is the total of the claimed damages for repairs, personalty, and incidentals for the 1999 floods. There was material evidence to support the jury's award of damages in the amount of $3,820.50. As such, we affirm the award of damages.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellants, George R. Caldwell, Jr. and Angie R. Caldwell, and their surety.

_____
D. MICHAEL SWINEY, JUDGE